IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,631

STATE OF KANSAS,
*Appellee*,

v.

KYLIE JO ELIZABETH WALDSCHMIDT,
*Appellant*.

SYLLABUS BY THE COURT

1.

Under K.S.A. 2022 Supp. 21-5402(c)(2)(D) and (F), aggravated assault, as defined in K.S.A. 2022 Supp. 21-5412(b), and amendments thereto, and aggravated battery, as defined in K.S.A. 2022 Supp. 21-5413(b)(1), and amendments thereto, can both serve as predicate felonies for felony murder if they are so distinct from the killing as to not be an ingredient of the killing.

2.

The merger doctrine examines whether an inherently dangerous felony is part of the killing, or if it stands as an independent predicate felony supporting a felony murder charge. This assessment hinges on factors such as the temporal and spatial proximity between the predicate felony and the killing, as well as the causal relationship between them.

3.

Felony murder holds a defendant strictly liable for homicides occurring in the commission of, attempt to commit, or flight from any inherently dangerous felony. Consequently, self-defense can never be a legal justification for the killing itself; it may

1

be asserted only in felony-murder cases to the extent it may negate an element of the underlying inherently dangerous felony.

4.

Under K.S.A. 60-404, evidentiary claims, including those concerning questions and responses during witness examination, must be preserved for appellate review by a contemporaneous and specific objection at trial.

5.

Prosecutors commit error by stating their opinions to the jury.

6.

Under both the United States and Kansas Constitutions, a criminal defendant has the right to present their defense theory, and excluding evidence integral to that theory violates their fundamental right to a fair trial. To constitute error, the excluded evidence supporting the defense theory must be relevant, admissible, and noncumulative.

7.

Under K.S.A. 60-407(f), all relevant evidence is admissible unless barred by statute, constitutional provisions, or caselaw. When a defendant's intent is in question, a trial court must allow the defendant to testify about the defendant's motive and actual intent, or state of mind, provided that such testimony aligns with our legal principle.

8.

K.S.A. 2022 Supp. 22-3414(3) provides that no party may claim as error the giving or failing to give an instruction unless that party timely objects by stating a specific ground for objection or unless the instruction or failure to give an instruction is clearly erroneous.

9.

Unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 2022 Supp. 22-3414(3) limits a party's ability to claim them as error. Our caselaw suggesting otherwise is disapproved.

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Oral argument held December 13, 2022. Opinion filed April 12, 2024. Affirmed.

*Corrine E. Gunning*, of Kansas Appellate Defender Office, argued the cause, and *Bryan W. Cox*, of the same office, was with her on the briefs for appellant.

*Aaron J. Cunningham*, assistant county attorney, argued the cause, and *Derek Schmidt*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

BILES, J.: Kylie Waldschmidt directly appeals her convictions for aiding and abetting felony murder and interference with a law enforcement officer arising from the killing of Diego Gallaway by Ryan Thompson. We affirm.

We hold: (1) the district court did not err by rejecting Waldschmidt's merger claim; (2) the court's omission of a self-defense instruction was not clearly erroneous; (3) prosecutorial error occurred, although none of the errors require reversal either individually or collectively; (4) the district court did not violate Waldschmidt's right to present her defense theory by sustaining an objection to a question about her intent; and (5) cumulative error does not require reversal. In so ruling, we determine that unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 2022 Supp. 22-3414(3) limits a party's ability to claim them as error. Our caselaw suggesting otherwise is disapproved.

## FACTUAL AND PROCEDURAL BACKGROUND

Gallaway and Waldschmidt began a romantic relationship in 2014. For several years, they were friends with Thompson. He sold them methamphetamine and all three regularly used the drug. About a week before his killing, Gallaway accused Thompson of having a sexual relationship with Waldschmidt. Thompson denied it because "at the time I wasn't." But a few days later Thompson and Waldschmidt began an intimate relationship, and she stopped living with Gallaway and stayed with Thompson.

Waldschmidt expected money from Gallaway because he claimed their children on his tax return, but he threatened not to give it to her. She and Thompson discussed ways to get her share if he reneged. Thompson even called Gallaway's bank, pretending to be him, and helped set up a PayPal account for a transfer. They never got the money before he died.

On February 27, 2019, the day of the homicide, Waldschmidt planned to return Gallaway's debit card she used with his consent during their relationship. She said she intended to drop it off at Gallaway's apartment because he was "angry" about it and her relationship with Thompson. She asked Thompson to go with her.

On their way to Gallaway's, Waldschmidt drove to Alysha Meade's residence, where Thompson sold Meade methamphetamine and got a gun. Waldschmidt waited in the car. Thompson testified he took the pistol out of his pocket when he re-entered the car and put "it down on the floorboard and jacked a few rounds through it, just to make sure it wouldn't jam, and then checked the safety."

4

When police interviewed Thompson after the killing, he said Waldschmidt was "relieved" he brought the gun and felt safer knowing he had it. He also said she "freaked out" about the gun when he was "function-checking" it. He put the gun between the passenger seat and console after chambering a bullet. At trial, he told a different story. He claimed Waldschmidt said nothing about the gun and may not have even seen it because "she was driving, it was dark, and I was down on the floorboard" hidden behind the "big center console." He denied showing her the gun. She denied ever seeing it in the car.

When they arrived at Gallaway's apartment about 10 p.m., Thompson told Waldschmidt to back into a parking spot "so they could get away should things go south." She parked near a shed "right next to the back door of [the] apartment." Thompson got out and smoked a cigarette. He put Gallaway's debit card on the car hood and then swapped places with Waldschmidt, so she sat in the passenger's seat. He called Gallaway using Waldschmidt's phone to tell him they were there to return the debit card. When Gallaway came out, he ignored the card and went straight for the vehicle's passenger side.

Thompson and Waldschmidt gave similar accounts about what happened next. She said at trial:

> "I just remember [Gallaway] coming out and coming to my window and yelling and screaming at me, trying to open the door, and [Thompson] came up to him. I do remember there was some words exchanged between the two of them. [Thompson] told him to get his card and go back in the house. And [Gallaway] said, 'What the fuck are you going to do about it, man?' And that's when a physical confrontation ensued.
>
> "And I—I saw them struggle. I couldn't hear them though after a little bit, because they were not in earshot anymore, so I don't know if there were more words exchanged. I don't know. I heard a pop, and I seen somebody fall to the ground. And that's when I got out of the car and seen [Gallaway] laying there on the ground, and I

immediately ran up to him. And [Thompson] told me, 'Don't look at him, go inside and call 9-1-1.' And so I did."

She saw Thompson throw the gun into the snow. She went into the apartment to call 911. She did not see Thompson leave. During the 911 call, Waldschmidt told the dispatcher her "ex-boyfriend just came at my boyfriend with a gun."

Police found a .22 caliber pistol near Gallaway's body. An officer attempted CPR, but Gallaway died moments later. An autopsy confirmed he died from a single gunshot to the back of the head. The wound had an irregular shape consistent with the gun barrel being pushed up against the skin. His index finger was lacerated, his face showed swelling, and his shoulder had abrasions. The coroner speculated Gallaway injured his hand by reaching back to grab the gun barrel before it fired, although he observed no soot in the wound.

The State charged Waldschmidt with one count of aiding and abetting felony murder during the commission of aggravated assault or aggravated battery and one count of interference with law enforcement by giving false information. Thompson pled guilty to second-degree murder in a separate case. The jury found Waldschmidt guilty as charged. The district court imposed a hard 25 life sentence for the murder and a six-month consecutive prison term for the interference. Waldschmidt directly appeals.

MERGER OF THE PREDICATE FELONIES

Felony murder is the killing of a human being "in the commission of, attempt to commit, or flight from any inherently dangerous felony." K.S.A. 2022 Supp. 21-5402(a)(2). If a death occurs in the context of an inherently dangerous felony, all

6

participants are guilty of felony murder, irrespective of who actually killed the person. *State v. Pattillo*, 311 Kan. 995, 1000, 469 P.3d 1250 (2020).

Aggravated assault and aggravated battery can both serve as predicate felonies for felony murder if they are "so distinct from the homicide . . . as to not be an ingredient of the homicide." K.S.A. 2022 Supp. 21-5402(c)(2)(D), (c)(2)(F). This means both are subject to the merger doctrine, which examines whether the underlying felony is part of the killing as opposed to an independent predicate crime supporting felony murder. See *Pattillo*, 311 Kan. at 1000-01.

Before trial, Waldschmidt moved to dismiss the felony-murder charge on a theory of merger, arguing both predicate felonies were not so distinct from Gallaway's killing. The district court rejected this argument during pretrial proceedings and again at trial. She repeats it now on appeal. We hold the district court did not err.

*Standard of review*

We review the district court's ruling under the merger doctrine de novo. See *State v. Reed*, 302 Kan. 390, 397-98, 352 P.3d 1043 (2015). To the extent the governing statute, K.S.A. 2022 Supp. 21-5402(c)(2), requires a predicate felony be "so distinct from the homicide," a district court, as a gatekeeper, makes a legal determination whether the evidence is strong enough to reach a jury. Cf. *State v. Pepper*, 317 Kan. 770, 776, 539 P.3d 203 (2023); *State v. Wade*, 284 Kan. 527, 540, 161 P.3d 704 (2007).

*Additional factual and procedural background*

After the preliminary hearing, Waldschmidt moved to dismiss the felony-murder count by focusing on how Thompson used the handgun:

"A review of the Preliminary Hearing Transcript herein should show that *Ryan Thompson's producing a handgun, pointing the same at [Gallaway]*, and firing one (1) shot, killing [Gallaway] is all part of one 'single assaulting incident' that resulted in death and merges with the homicide." (Emphasis added.)

In response, the State more expansively summarized its factual allegations: Waldschmidt and Thompson drove to Meade's house to sell her methamphetamine. While there, Meade gave Thompson the gun. The pair then drove to Gallaway's apartment to return his debit card. They intended to have Thompson either scare him or "beat his ass." Thompson called Gallaway to say they arrived with his debit card. Gallaway came out and confronted Waldschmidt. Thompson retrieved the gun, walked around the car, came up behind Gallaway, and placed him in a headlock. The pair struggled away from the car "for several feet" until they backed into a shed where Thompson shot Gallaway in the head and killed him.

The State referenced the coroner's testimony about the headlock and described abrasions on Gallaway's arm and shoulder, as well as injury to his lower jaw and discoloration along the right side of his face consistent with someone placed in a headlock. The coroner observed marks "on the back of the head where a gunsight would've been pressed into the head." The State then articulated how these allegations satisfied the elements for both aggravated assault and aggravated battery.

At a pretrial hearing, defense counsel again described Thompson as getting out of the car, advancing toward the victim, and pointing the gun in Gallaway's direction. Counsel summarized the coroner's testimony as Thompson and Gallaway "struggling over the gun, Mr. Ryan Thompson prevailed, placing [Gallaway] in a headlock and administering the fatal shot." Counsel noted there was "some question as to how long this

8

struggle ensued" and argued: "[I]t was all very lineal. The gun is produced, pointed at decedent, contact is made with the decedent while decedent is being restrained. The shooter, Mr. Thompson, places gun to decedent's head and delivers one fatal shot."

The court overruled Waldschmidt's motion in a written decision. In its factual recitation, the court saw the case as the State did—Thompson began the struggle by retrieving the gun, walking around the front of the car, coming up behind the victim and placing him in a headlock with Thompson "ultimately" shooting the victim in the head, several feet away from the car. The court noted the coroner's testimony about the struggle explained Gallaway's abrasions on his left upper arm and left upper shoulder and damage to his lower jaw and discoloration. It concluded:

> "[T]he elements of both Aggravated Assault and Aggravated Battery are distinct from the act of shooting the gun, which ultimately killed Gallaway. There were messages regarding beating up Gallaway before the incident and testimony that [Waldschmidt] stated the gun was present to scare Gallaway. Before the shot that killed Gallaway, there was a struggle after Gallaway was placed in a headlock. The gun was visible. According [to] the Coroner, there were injuries consistent with the headlock when Thompson had his arm around Gallaway's neck and throat. The struggle began at the car. Gallaway's body ended up several feet away from the car. Taking away the shot itself that killed Gallaway, the other testimony independently supports the underlying alternative felonies which are distinct from the homicide itself. As such, the Motion to Dismiss is denied."

After the State rested its case-in-chief, Waldschmidt moved for directed verdict, largely based on the pretrial merger motion, adding that Thompson testified the struggle lasted "15 to 30 seconds." The court summarized this as the "time sequence is of such brevity that it couldn't constitute the commission of either aggravated assault or aggravated battery." Defense counsel agreed, describing what happened as the "infamous

9

single act." The State countered, "Whether it was 15 seconds or a minute . . . both an aggravated assault and an aggravated battery could occur in that timeframe."

After hearing the parties' arguments, the court found sufficient evidence "to let that issue reach the jury." It noted Thompson's testimony demonstrated "the events [were] anywhere from 15 to 30 seconds to a minute," and that the coroner's testimony stated "there was evidence of a battery that occurred in conjunction with or just prior to the shooting."

At the close of evidence, Waldschmidt renewed the merger motion summarily without refinements. The court again ruled sufficient evidence existed to submit the matter to the jury.

*Discussion*

Felony murder requires proving two causation elements: (1) the death must occur within the res gestae of the underlying felony; and (2) there must be a direct causal connection between the felony and the homicide. *State v. Phillips*, 295 Kan. 929, 940, 287 P.3d 245 (2012). Res gestae refers to acts before, during, or after the principal occurrence that are so closely connected with the principal occurrence to actually be a part of it. A direct causal connection exists unless an extraordinary intervening event supersedes the defendant's act to become the sole legal cause of death. Three factors—the time, distance, and causal relationship between the underlying felony and the killing—determines whether the underlying felony is part of the killing. 295 Kan. at 940-41.

In Waldschmidt's case, the jury returned its guilty verdict for the felony-murder count on both aggravated assault and aggravated battery. The jury instructions were modeled after PIK and recited aggravated assault's generic elements:

10

"a. Ryan Thompson knowingly placed or attempted to place, [Gallaway] in reasonable apprehension of bodily harm.

"b. Ryan Thompson did so with a deadly weapon.

"c. A 'deadly weapon' is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury."

Similarly, the jury instructions set out aggravated battery's generic elements:

"a. Ryan Thompson knowingly caused physical contact with [Gallaway] in a rude, insulting or angry manner with a deadly weapon.

"b. A 'deadly weapon' is an instrument which, from the manner in which it is used, is calculated or likely to produce death or serious bodily injury."

In arguing against the verdict, Waldschmidt cannot overcome the questions of fact created by the disputed evidence that the jury resolved against her. For example, there was inconsistent evidence about the time elapsed between Thompson rounding the front of the car with the gun and the fatal shot. Thompson at one point testified the "whole episode" took between 30 seconds and a minute from the time Gallaway came up to the car. In other testimony, he estimated the fight itself lasted less than 30 seconds and even said "[t]he total time from me going over to the other side of the car and him getting shot is less than 10, 15 seconds easy." Thus, while one comment suggests a timeframe of a minute, other evidence contradicts that. The jury was left to resolve it.

Likewise, the jury had to assess Thompson's credibility when he testified that he rounded the car with the gun pointed at the ground, not Gallaway, because the "assaultive conduct" (showing Gallaway the gun) is different from pointing the gun and firing it in

11

one continuous movement. Particularly, Thompson claimed Gallaway grabbed the gun and inadvertently brought it toward his own body, and that Thompson only then hit the trigger. Viewed in this light, Thompson's act of displaying the gun precipitated the struggle that, ultimately, concluded in Gallaway's death.

But in another account, Thompson testified he exited the car with the gun, "cleared the passenger side and [Gallaway] saw the gun, [and] that's when [Gallaway] came with his right hand." Thompson said after that he pulled Gallaway back to "try to get him to let go of it. It turned his body, so I put him in a headlock." Thompson said he used his left arm to put Gallaway in a headlock that "[Gallaway] did not get out of" until "I threw him out of the headlock. I threw his whole body." Thompson agreed that this caused "a separation" of the two before he fired.

The evidence presents conflicting perspectives, but it provides sufficient grounds for the jury to conclude Thompson's act of displaying the gun was not "'a single instance of assaultive conduct'" resulting in Gallaway's death—even if it led to it. See *State v. Sanchez*, 282 Kan. 307, 319, 144 P.3d 718 (2006). The essence of the purported aggravated assault—as described by Thompson—was distinct enough from the act that killed Gallaway for the jury to consider when deciding whether Waldschmidt aided and abetted felony murder.

As for the aggravated battery, the district court noted the evidence created jury questions about the struggle just prior to the shooting. The State's medical evidence detailed discoloration on the right side of Gallaway's face and some "indistinct areas of swelling from the lateral face up across the cheek near the eye." When asked for a potential cause, the coroner testified it "[c]ould be a direct blow; could be a broad surface like an arm, an elbow, a knee, or a hip could have struck the individual cross this area." The coroner also mentioned abrasions to the upper left arm and injuries to the body, "the

12

size range of somebody having grabbed him there." He noted torn skin on the fingers and a "taller oval-shaped wound that couples immediately with a trapezoidal, a rectangular injury," "similar to the front sight of a gun that was present at the scene" on the head. And the coroner believed the victim's left hand reached back to try to grab the gun barrel or the gun during the struggle, causing an injury on the index finger. He also detailed other injuries, including contusions on the right side of the face and left upper arm and shoulder and lacerations to the fingers consistent with struggling to get control of a handgun.

On cross-examination, the coroner described breaking or injuring the hyoid bone in the neck with a headlock. He also said using arms would have spread the force across a wider diameter that "may not break the hyoid bone, but you can shut off blood flow and air flow." He did not see any petechiae, which would show restricted breathing by closing off the airway, but he noted it could result from an arm around someone's neck. This prompted redirect about not necessarily breaking the hyoid bone. The prosecutor inquired whether hypothetically if an individual approached Gallaway from behind, "put him in a choke hold, put the gun to the back of his head, you would have . . . that could happen and still have what you found." The coroner said, "Yes."

The coroner added this could explain reaching back for the gun with the left hand and a potential for injury on the right hand. Then, there was this exchange:

> "Q. So under the scenario I gave you or hypothetically I gave you, a person putting him in [a] choke hold, putting the gun to the bottom of his skull, that [is] consistent with your report.
>
> "A. It is."

13

Again, the evidence conflicts. But its strength warranted Waldschmidt's case proceeding to trial, affording the jury the opportunity to carefully weigh it and arrive at a factual conclusion about what happened. As the State's brief argues:

> "Thompson's account explains that by placing [Gallaway] in a headlock, he was using his arms as a deadly weapon in which they were used, calculated, or likely to produce death or serious bodily injury. See *In re J.A.B.*, 77 P.3d 156, 31 Kan. App. 2d 1017 (2003) (whether an instrument is a deadly weapon, for purposes of aggravated battery is tied to the circumstances in which the instrument is used, this determination is generally a question reserved to the finder of fact). [Coroner] established [Gallaway] sustained injuries consistent with being placed in a headlock. Here, holding [Gallaway] in the headlock, prior to the struggle over to the shed, Thompson completes the crime of aggravated battery, prior to the causal act which led to [Gallaway's] death."

Finally, we mention Waldschmidt's newly raised assertion on appeal that the State abandoned the headlock as a basis for aggravated battery. Her opening brief made this short, cryptic, and undeveloped comment: "After it presented its evidence at trial, *the State no longer relied on the headlock*, but instead argued to the jury that the act was touching [Gallaway] with the gun." (Emphasis added.) She cited three pages from the trial record as support without further explanation or legal authority, and the cited pages do not compel us to conclude the State abandoned the headlock as a factual element.

As a matter of appellate practice, we fail to see how this brevity creates a substantive issue for the State or this court to follow up on. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) ("Issues not briefed are deemed waived or abandoned."). The only statement from the State's response brief that might relate argues:

> "It has consistently been the State's theory that Thompson committed multiple felonies that day (two aggravated assaults—the second of which would merge, two

14

aggravated batteries—the second of which would merge, and a murder). The State asserts Thompson commits an aggravated assault when Thompson initially clears the passenger side and [Gallaway] sees the gun. Thompson then commits an aggravated battery when he places [Gallaway] in a headlock. Following the headlock, Thompson throws [Gallaway] aside separating the two of them. Thus, completing the first aggravated assault and the first aggravated battery (which do not merge). After Thompson throws [Gallaway] aside, Thompson points the gun at [Gallaway] a second time, committing the second aggravated assault (which merges). Thompson then commits a second aggravated battery by 'jamming' the barrel of the gun to [Gallaway]'s head (which merges)."

As readily seen, the State conceded its self-described "second" aggravated assault (pointing the gun just before firing) and its so-called "second" aggravated battery (striking the gun barrel to Gallaway's head) merged with the murder, so those "second" felonies were not at issue. But the State also argues against merger based on each alleged felony's time, distance, and causal relationships from the killing, distinguishing the "initial aggravated assault and aggravated battery from the terminal aggravating battery."

Undeterred, Waldschmidt's reply brief continued: "While the State relied solely on the headlock during pretrial arguments regarding merger, it had abandoned that theory by the time it argued its case to the jury." She contended the State's case presented a multiple acts problem "resolved" only by abandoning the headlock theory. And she characterized the State's opening and closing statements as the "functional equivalent of an election" to drop the headlock, relying on *State v. Moyer*, 306 Kan. 342, 361, 410 P.3d 71 (2017) ("We have previously considered a prosecutor's opening statement and closing argument as constituting the functional equivalent of an election by the State.").

At oral argument, we asked the State about this election claim. It noted the prosecutor's closing referenced both the headlock and the medical testimony about bruising and abrasions resulting from it, as well as cuts caused by the gun. On rebuttal,

15

Waldschmidt repeated that the State "functionally elected" to proceed only on the gun as the instrument for the aggravated battery.

But the record does not establish Waldschmidt's newest contention if we can even call it that. In opening statements, the prosecutor began by telling the jury:

"On February 27, 2019, Ryan Thompson goes around the front of the defendant's car, grabs Diego Gallaway, forces him into a headlock, places the barrel of a .22 Browning Buck Mark gun against [Gallaway]'s head and [Gallaway] struggles for his life. He begins to force Thompson back up against the shed, when pop, the gun goes off. [Gallaway] goes limp and falls dead on the icy pavement of the parking lot, as the defendant watches from the safety of inside her car, which she drove there. The defendant Kylie Waldschmidt watches the father of her children die along with all of her hopes of getting the $10,000 tax return she felt so entitled to."

The prosecutor also said:

"The evidence will show that she did this by driving Thompson to [Meade's] house so he could pick up the murder weapon. Driving him to [Gallaway]'s apartment to confront [Gallaway], and going so as to distract [Gallaway] so Thompson could sneak up behind him, place him in a headlock and execute him. She sat silently as she watched Thompson sneak around [Gallaway] and [pull out] the murder weapon. She watched as he put him in a headlock, wrestled with him, and eventually pulled the trigger ending his life."

During closing, the prosecutor said:

"It was foreseeable exactly what was going to happen; a fight. Only the fight turned deadly when Ryan Thompson took the gun. And remember the testimony of Thompson and Kylie Waldschmidt; had [Gallaway] in a headlock, gun gets jammed up into the head, and as [the coroner] testified to, we had a contact injury; that funny star-

16

shaped injury where it doesn't look like a hole in the head, the little-starring pattern, because of the gas. Instead of coming out from the barrel, goes into the skin. This was a contact wound. The headlock, and the gun right up against the skull. The wound happened from behind."

If Waldschmidt intended to present a multiple acts issue or a functional election argument for the first time on appeal, her approach here is incorrect. See Supreme Court Rule 6.02(a)(5) (2023 Kan. S. Ct. R. at 36) ("If the issue was not raised below, there must be an explanation why the issue is properly before the court."); *State v. Harris*, 311 Kan. 371, Syl. ¶ 1, 461 P.3d 48 (2020) ("Generally, an appellate court does not address issues for the first time on appeal.").

Even so, the passing reference to *Moyer* seems out of place. In *Moyer*, the State itself argued it elected among multiple acts, and the court agreed, noting:  "For the most part, the [trial] record confirms the State's contention." *Moyer*, 306 Kan. at 360. But we see nothing in the State's opening or closing statements expressly telling the jury to ignore the headlock or, more pointedly, to abandon the headlock as a predicate felony. And the State certainly does not argue it made such an election.

We hold the district court did not err by rejecting Waldschmidt's merger argument.

### FAILURE TO GIVE USE-OF-FORCE INSTRUCTIONS

Waldschmidt claims the district court erred by failing to sua sponte instruct the jury on the use of force in defense of a person or in defense of an occupied vehicle. See K.S.A. 2022 Supp. 21-5222 (self-defense, defense of another); K.S.A. 2022 Supp. 21-5223 (defense of occupied vehicle); K.S.A. 2022 Supp. 21-5224 (use of force); PIK Crim. 4th 52.200 (2021 Supp.); PIK Crim. 4th 52.210 (2021 Supp.). She argues that if Thompson lawfully defended himself or her, he would not have committed any felonies,

so she could not be convicted of aiding and abetting felony murder. We hold the omission of the unrequested use-of force instructions was not clearly erroneous as required by K.S.A. 2022 Supp. 22-3414(3) and, therefore, cannot be assigned as error on appeal.

*Standard of review*

Waldschmidt concedes she did not request instructions addressing the use of justifiable force, so she must establish clear error. See K.S.A. 2022 Supp. 22-3414(3). And to do that, she has the burden to firmly convince us the jury would have reached a different verdict had the unrequested instructions been given. See *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

*Discussion*

We begin by considering whether the instructions at issue would have been legally appropriate. In *State v. Milo*, 315 Kan. 434, Syl. ¶ 1, 510 P.3d 1 (2022), we clarified:

> "Felony murder imposes strict liability for homicides caused by the attempt to commit, commission of, or flight from an inherently dangerous felony. Thus, self-defense is never a defense to felony murder. A self-defense instruction may only be given in felony-murder cases to the extent it may negate an element of the underlying inherently dangerous felony."

Given this, we "must first examine the elements of the underlying inherently dangerous felony alleged by the State to determine whether any of those elements can be negated by a claim of self-defense. If the answer is no, then the self-defense instruction will not be legally appropriate." 315 Kan. at 443. The State's theory of aggravated assault required proof Thompson placed Gallaway in reasonable apprehension of bodily harm by using a deadly weapon. Its aggravated battery theory was that Thompson "knowingly

18

caused physical contact with [Gallaway] in a rude, insulting or angry manner with a deadly weapon[,]" which occurred by placing him in a headlock during their fight.

Both crimes contain elements of force. See K.S.A. 2022 Supp. 21-5221(a) (defining "use of force" and "use of deadly force"). But "some crimes contain an element—the use of force—which may be negated by a proper claim of self-defense." *Milo*, 315 Kan. at 444. And unlike aggravated robbery, nothing in the crime of aggravated assault or aggravated battery is inherently inconsistent with use of lawful force. See *State v. Holley*, 315 Kan. 512, 519, 509 P.3d 542 (2022) (discussing self-defense in the aggravated robbery context). Both crimes here can fit this criterion. We hold the omitted instructions would have been legally appropriate.

Turning next to whether the instructions were factually supported, the State argues Thompson could not claim a use-of-force defense because he provoked the fight that ended with Gallaway's death. See K.S.A. 2022 Supp. 21-5226 (justifications described in K.S.A. 2022 Supp. 21-5222 and K.S.A. 2022 Supp. 21-5223 are unavailable to initial aggressors). But our standard of review requires we weigh the evidence in Waldschmidt's favor, not the State's, and there is contrary evidence supporting use-of-force instructions. See *State v. Kahler*, 307 Kan. 374, 396, 410 P.3d 105 (2018).

When evaluating the factual appropriateness of justifiable use-of-force instructions, courts apply a two-pronged test.

> "'The first [prong] is subjective and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others. The second prong is an objective standard and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary.'

19

"In *State v. Haygood*, 308 Kan. 1387, 1405-06, 430 P.3d 11 (2018), this court cautioned against confusing the subjective and objective requirements. Even if the only evidence supporting the defendant's theory consists of the defendant's own testimony, which may be contradicted by all other witnesses and by physical evidence, the defendant may have met his or her burden of showing that a reasonable person in his or her circumstances would have perceived the use of deadly force as necessary self-defense. [Citations omitted.]" *State v. Qualls*, 309 Kan. 553, 557-58, 439 P.3d 301 (2019).

The pertinent statutes regarding a person's use of force in response to another's use of force are instructive. In the context of this case, K.S.A. 2022 Supp. 21-5222(a) permits Thompson to use "force against [Gallaway] when and to the extent it appears to [Thompson] and [Thompson] reasonably believes that such use of force is necessary to defend [Thompson] or [Waldschmidt] against [Gallaway's] imminent use of unlawful force." K.S.A. 2022 Supp. 21-5222(b) permits the use of deadly force here "if [Thompson] reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to [Thompson] or [Waldschmidt]." And K.S.A. 2022 Supp. 21-5223 extends the justified use of force and deadly force to situations involving protection of occupied vehicles. Use of force includes "[w]ords or actions that reasonably convey the threat of force"; use of deadly force "means the application of any physical force . . . which is likely to cause death or great bodily harm." K.S.A. 2022 Supp. 21-5221(a)(1)-(2).

Both Thompson and Waldschmidt's testimony supports a possible finding Thompson sincerely and honestly believed he needed to display the gun to persuade Gallaway to stand down or to subdue him with a headlock. And when viewed in a light most favorable to Waldschmidt, sufficient evidence supports that a reasonable person in Thompson's situation would perceive the use of such force as necessary, given Gallaway's angry words and aggressive actions while arguing with Waldschmidt. The district court should have given the instructions sua sponte.

20

Even so, we are not firmly convinced this would have changed the outcome. Waldschmidt gave statements to police suggesting Thompson devised a plan—the details of which she was unaware—to rob Gallaway. At another point, Waldschmidt told police she thought Thompson "just wanted to scare and teach [Gallaway] a lesson, whatever, it got out of hand." And for his part, Thompson disclaimed the existence of any such plan, while cavalierly testifying he often lied to law enforcement. The jury also had messages between Waldschmidt and Thompson discussing what to do with Gallaway, the picking up of the handgun, checking its functionality on the way to the crime scene, Waldschmidt's driving to Gallaway's apartment, and her admission that she lied to police to cover up the crime. The jury also had the coroner's testimony that Gallaway's injuries reflected an execution-style murder in that he was held from behind, in a choke hold, with the barrel placed at the base of his skull.

We hold the jury instructions omission was not clearly erroneous, so under K.S.A. 2022 Supp. 22-3414(3) this matter cannot be assigned as error on appeal.

PROSECUTORIAL ERROR

Waldschmidt advances multiple claims of prosecutorial error. She contends the prosecutor made improper comments on witness credibility, misstated facts, and misstated the law. We agree in a few instances but hold none require reversal—either individually or collectively.

*Standard of review*

Appellate courts analyze prosecutorial error claims in two steps: error and prejudice. First, we decide whether the challenged actions fall outside the wide latitude afforded a prosecutor in conducting the State's case in a manner that does not offend a

21

defendant's constitutional right to a fair trial. In doing so, we evaluate each challenge in the context in which it occurred, rather than in isolation. Still, a prosecutor commits error when misstating the law or arguing facts or making factual inferences with no evidentiary foundation. And if we find error, we determine whether it prejudiced the defendant's due process rights to a fair trial by applying the constitutional harmlessness standard. *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019).

*Opening statements*

Waldschmidt challenges the prosecutor's statements suggesting she "distract[ed] Gallaway so Thompson could sneak up behind him, place him in a headlock and execute him." She argues the evidence did not support this, so the prosecutor strayed from the evidence the State expected to prove during trial. We disagree.

Opening statements help a jury understand what each side expects the evidence will prove and frame the questions the jury will need to decide. Prosecutorial error in that context occurs when a prosecutor strays outside the wide latitude recognized in *State v. De La Torre*, 300 Kan. 591, 609, 331 P.3d 815 (2014). Here, the prosecutor drew a fair inference that Waldschmidt's presence would distract Gallaway based on the expected evidence. This included a long, acrimonious relationship between Gallaway and Waldschmidt, his ire over her new relationship with Thompson, and the hostile communications shared that day, including various threats Gallaway ostensibly sent about Thompson. The same is true for the inference she was there to distract Gallaway so Thompson could shoot him as the "backup plan." No error occurred.

22

*Cross-examination*

Waldschmidt asserts prosecutorial error for the cross-examination about her brief move to Lawrence in 2018 and oldest child's parentage. She claims the prosecutor lacked good faith to ask these questions and intended to denigrate her as an unfaithful woman. We disagree. As we read the record, the question about her temporary move to Lawrence a few months before the killing was relevant to her turbulent relationship with Gallaway—a major theme of the State's case. And the question about her oldest child's parentage just clarified an ambiguity in her testimony about what she meant by stating Gallaway was "a father" to the child.

Even so, she miscasts this as prosecutorial error. In *State v. George*, 311 Kan. 693, 701-02, 466 P.3d 469 (2020), the court noted a distinction between prosecutorial error and a prosecutor's efforts involving admission or exclusion of evidence, such as witness questioning on particular topics. The *George* court explained: "'In accordance with the plain language of K.S.A. 60-404, evidentiary claims—including claims concerning questions posed by a prosecutor and responses to those questions during trial—must be preserved by way of a contemporaneous objection before those claims may be reviewed on appeal.'" 311 Kan. at 703. This means Waldschmidt's argument is more properly categorized as an unpreserved challenge to the admission of evidence because there was no contemporaneous objection.

*Closing arguments—comments on credibility*

Waldschmidt contends the prosecutor's comments in closing arguments improperly bolstered law enforcement witnesses' credibility and undermined hers. The prosecutor said:

23

"Before I get too caught up in responding to the arguments of [defense counsel], *I want to take just a moment to also compliment law enforcement on their efforts in this case to investigate this case*. What started out with a *lie* of 'my ex-boyfriend came at my current boyfriend with a gun, and they wrestled over it, and a bad thing happened,' due to the efforts of [law enforcement officers], we got to find out the real story; that that was a *lie* that she was telling to law enforcement . . . from the get-go." (Emphases added.)

Later, the prosecutor commented:

"[Waldschmidt] continued to *lie* all the way through the first half of the interview with [law enforcement] on March 8th. And it was only at the second half of the interview on March 8th when she started to give some of the *truthful* elements to law enforcement. *That shows her true intent in this matter, to continue to cover up the agg assault and the agg battery which resulted in the murder*. And she continued to cover that up all the way through March 8th, and *dare I say with her testimony here at trial, she continues to try to cover this up*." (Emphases added.)

Beginning with the compliment to law enforcement, we hold it introduced prosecutorial opinion to bolster law enforcement reliability as witnesses. This was error. Prosecutors step outside their recognized wide latitude when they state their own belief as to witness credibility. See *State v. Gulley*, 315 Kan. 86, 95, 505 P.3d 354 (2022). Prosecutors are not to personally comment on the evidence or declare law enforcement efforts led to finding the "real story." That said, this occurred just once and was not part of a grander theme, so its impact had to be minimal.

Similarly, the prosecutor erred by telling the jury, "[D]are I say with her testimony here at trial, she continues to try to cover this up." The prosecutor's "[D]are I say" aside again amounts to giving a personal view. But we reject Waldschmidt's claim that the prosecutor impugned all her trial testimony. The reference to "this" plainly relates to

24

specific statements attributed to her in a police interview report about the aggravated assault and aggravated battery.

We also hold no error occurred from the comment that Waldschmidt "lied" to investigators. After all, she admitted lying to police; and the State charged her with knowingly giving false information to law enforcement. So given the nature of the charge against her—with distinct elements of knowingly reporting false information to the police with intent to induce, impede, or obstruct a homicide investigation—it makes sense that both sides occasionally fell into describing things she said as "lying." For example, defense counsel in closing argument told the jury: "[W]hat I would suggest you might do is determine if *a lie or false statement* was made by Kylie on that date as opposed to some other dates." (Emphasis added.) Counsel further identified a State exhibit as "the essential evidence for the *obstruct/lie* to law enforcement charge." (Emphasis added.) Waldschmidt also acknowledged lying to police during her 911 call to report Gallaway's death.

*Closing arguments—discussing facts*

Waldschmidt objects to aspects of the prosecutor's arguments as misstatements of fact. First, she asserts the remark that the evidence did not support she "knew there was going to be a fight." But during his interview, Thompson told detectives Waldschmidt knew about the gun and was "relieved" that he brought it. Likewise, in at least one interview, Waldschmidt admitted she was aware of the potential for a fight. And the State presented evidence Gallaway threatened Thompson; that Waldschmidt called Gallaway "very abusive" in a message sent to her brother that she forwarded to Thompson; and that she thought of Thompson as a "thug," clarifying to police that thugs don't like "people who treat their children, or the mothers of their children in the manner that [Gallaway]

25

treated me." The evidence supported the prosecutor's inference, even though both Waldschmidt and Thompson tried to debunk it at trial. We hold no error occurred.

Second, Waldschmidt disputes the prosecutor's characterizations of Facebook messages between her and Thompson. The relevant messages range from just over two days prior to the shooting to within seven hours before it. They are in three blocks of time:  the first, between 6:46 and 6:52 p.m. on February 25; the second, between 10:31 and 10:37 p.m. on February 26; and the third, between 2:30 and 3:25 p.m. on February 27.

Waldschmidt's arguments require some fleshing out. She first focuses on the prosecutor's comment concerning the second block of time. The prosecutor said,

> "[Waldschmidt] is sending [Thompson] the information about her brother going over and beating up [Gallaway] and no cops being called. They are talking about the robbery. They are talking about the backup plan. And at the end of it, at 4:36:28 [10:36 p.m.] [Waldschmidt] says, 'So? So are we going to go do this or what. So? Let's go do this.'"

She asserts the "So?" comment references "the robbery" and correctly notes the first—and only—mention of a "backup plan" came during the third block of messages, roughly 17 hours later, at 3 p.m. on February 27, about seven hours before Gallaway's killing. She labels this as a misrepresentation. But Waldschmidt admitted she was aware of a plan to rob Gallaway, though she claimed at trial this "plan" was not even "[h]alf-baked." She also told the jury:  "I would just say those are comments from a thug who thinks that he's cool." So despite her attempts to downplay the degree of planning, the State's closing drew reasonable inferences given the Facebook discussion, the timing before Gallaway's death, her concession she knew Thompson may have planned to rob

26

Gallaway, and Thompson's admission the pair talked in person about all of this. There was no error in the challenged remark.

Waldschmidt next questions four statements by the prosecutor:

"They stopped and got a gun. This is after they had already talked about the fact that [Gallaway] needed his ass whooped. This is after they talked about 'maybe I should just put a gun down his throat.'

. . . .

"But it went south, just as [Waldschmidt] had predicted it would. That prediction is called foreseeability. And she's not the only one who foresaw that, and she's not the only one that can foresee that. I think you as jurors using your own common sense and experience can certainly see the foreseeability of what was going to happen when they plot to put him in line, when they decided and agreed to teach him a lesson, to whoop his ass, and to put a gun down his throat.

. . . .

"How did Kylie Waldschmidt aid in the agg assault? She talked about it with Ryan Thompson. Discussed all the problems she was having with Diego Gallaway with Ryan Thompson. Talked about scaring him. Talked about threatening him. Talked about whooping his ass. Talked about putting a gun barrel down his throat.

. . . .

"[Waldschmidt] is responsible. She doesn't have to get out and wrestle with [Gallaway]. She didn't have to get out and do anything at the scene. She had talked about it, whooping his ass, talked about threatening him, putting the gun down his throat, talked about getting the money, talked about robbing him."

27

She parses the Facebook messages to argue the prosecutor either misquoted them or drew unreasonable inferences from them, or both. Again, we disagree. The evidence allowed the prosecutor to draw these inferences.

Lieutenant Jeffrey Ridgway testified about the potential significance of the Facebook messages. And when asked about Thompson telling Waldschmidt, "[A]s soon as I got back we would take care of [Gallaway]," the lieutenant said this meant physical harm to Gallaway. He also referred to another statement by Thompson, "Or I can just go around putting pistols down people's throats and catch charges," when asked if anything explained how Thompson might "take care of [Gallaway]." Then, the prosecutor and lieutenant had this exchange:

> "Q. Okay. Did the defendant in these messages at any point tell Thompson it wasn't necessary to use physical violence, or how she wanted to go about, quote, 'taking care of Diego,' end quote?
>
> "A. Not that I recall, no.
>
> "Q. In your review of these messages, did you find any sort of explanation as to why Thompson would be so committed to helping the defendant, quote, 'take care of Diego,' end quote?
>
> "A. On a couple of messages above, at 0049 as marked, the author Ryan Thompson indicates, quote, 'it's about taking care of you the way you taking care of me,' end quote."

The lieutenant also described discussions between Thompson and Waldschmidt about getting the tax refund from Gallaway's bank account. Later, the prosecutor asked if he noted "any express desires to commit physical violence" towards Gallaway in the

28

Facebook messages. He said he did, describing a photograph Waldschmidt sent Thompson with a notation, "See . . . Exhibit A, [Gallaway] needs ass whooped."

The wide latitude afforded prosecutors in crafting closing arguments allows them to make reasonable inferences based on the evidence. But their arguments must remain consistent with the evidence; error occurs if prosecutors assert facts or inferences not supported by the evidence. *State v. Maestas*, 298 Kan. 765, 774, 316 P.3d 724 (2014); *State v. Pabst*, 268 Kan. 501, 507, 996 P.3d 321 (2000) ("Stating facts not in evidence is clearly improper."). Here, the lieutenant described his understandings from the Facebook messages and other evidence that provided the prosecutor with a basis to draw as reasonable inferences the points argued. We hold no prosecutorial error occurred.

*Closing arguments—statements about the law*

Waldschmidt complains the prosecutor committed error while discussing the law on "foreseeability" and "aiding and abetting." The prosecutor read the jury instructions and attempted to explain their meaning. He said:

> "We have to prove that the defendant knowingly, i.e., her conduct and her actions were reasonably certain to cause the result complained about. Reasonably certain to cause the result which, again, I refer to when we talk about the foreseeability of the situation. The defendant knew what was going to happen when she took Ryan Thompson over there."

Waldschmidt asserts this misstated the law because, even if the statements between her and Thompson were acts of planning, they might be "at most" a potential conspiracy, and "[t]he *possibility* of a fight or aggravated battery or assault is not a reasonably foreseeable consequence of a conspiracy." But that assertion does not present any legal issue; what she argues on appeal is a factual question already resolved by the

29

jury. And to the extent she portrays this as a legal issue, we hold no error occurred. The governing law on foreseeability provides:

"(a) A person is criminally responsible for a crime committed by another if such person, acting with the mental culpability required for the commission thereof, advises, hires, counsels or procures the other to commit the crime or intentionally aids the other in committing the conduct constituting the crime.

"(b) A person liable under subsection (a) is *also liable for any other crime* committed in pursuance of the intended crime if *reasonably foreseeable by such person as a probable consequence of committing . . . the crime intended*." (Emphases added.) K.S.A. 2022 Supp. 21-5210.

The Kansas Criminal Code, K.S.A. 21-5101 et seq., does not define foreseeability, but the term is not hard to understand. See Black's Law Dictionary 792 (11th ed. 2019) (defining foreseeability as "[t]he quality of being reasonably anticipatable"); Merriam-Webster's New Collegiate Dictionary 490 (11th ed. 2020) (foreseeable means "being such as may be reasonably anticipated" or "lying within the range for which forecasts are possible"). Here, the prosecutorial remark—"The defendant knew what was going to happen when she took Ryan Thompson over there."—did not deviate from this common meaning.

Next, Waldschmidt argues the prosecutor misstated the law of "aiding and abetting" when telling the jury:

"How did Kylie Waldschmidt aid in this agg assault? She talked about it with Ryan Thompson. . . . Talked about scaring him. Talked about threatening him. Talked about whooping his ass. Talked about putting a gun barrel down his throat.

30

"Aided by driving. . . . [S]he drove him to Alysha Meade's to pick up the weapon. She drove him over to the site. She backed in [although she conceded it was weird.] Yeah, that was weird. And you know why that was weird? Because it wasn't about returning the card, it was about luring Diego Gallaway out to the car so she could frighten him with the gun they had just picked up."

She claims that "[m]erely discussing problems in her relationship or saying someone needs to have his 'ass whooped' does not demonstrate she was aiding or abetting Ryan to commit the alleged crimes," and the prosecutor's comment "does not reflect the law on aiding and abetting." But again, this reasoning concerns a factual determination, which was up to the jury.

As to aiding and abetting, the prosecutor properly reiterated the jury instruction by saying: "'A person is criminally responsible for the crime of another if the person either before or during the commission and with the mental culpability, knowingly, intentionally, aids the other person.'" This aligns with K.S.A. 2022 Supp. 21-5210. We hold no error occurred.

*Collective effect of two prosecutorial errors*

We conclude the prosecutor committed two errors: bolstering the witnesses' credibility and personally commenting on Waldschmidt's testimony. Considering the entire record, as previously discussed, we are comfortable their collective effect did not deprive Waldschmidt a fair trial beyond a reasonable doubt. Both remarks were minor and not repeated.

31

QUESTIONING ABOUT INTENT

Waldschmidt claims the district court infringed on the right to present her defense theory by denying the opportunity to answer a question about her intent in going to Gallaway's apartment. We disagree. This complaint centers on the following exchange:

"[DEFENSE COUNSEL:] Okay. Now, on February 27, 2019, did you intend to place Diego Gallaway in fear or apprehension of bodily harm?

"[PROSECUTOR:] Objection. Leading.

"THE COURT: It calls for a legal conclusion. Sustained."

*Standard of review*

Under both the United States and Kansas Constitutions, a criminal defendant has the right to present their defense theory, and excluding evidence integral to that theory violates their fundamental right to a fair trial. To constitute error, the excluded evidence supporting the defense theory must be relevant, noncumulative, and admissible. We review this type of alleged error de novo. *State v. Robinson*, 306 Kan. 431, 435-36, 394 P.3d 868 (2017).

Unless barred by statute, constitutional provision, or caselaw, "all relevant evidence is admissible." K.S.A. 60-407(f); *State v. Gunby*, 282 Kan. 39, 47, 144 P.3d 647 (2006). For relevancy, there are two elements: materiality and probativity. We review the former de novo and the latter for abuse of discretion. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 1, 303 P.3d 680 (2013). A court abuses its discretion when no reasonable person could agree with its decision or if its exercise of discretion is based on a factual or legal error. *State v. Butler*, 315 Kan. 18, Syl. ¶ 1, 503 P.3d 239 (2022).

*Discussion*

Waldschmidt correctly notes the district court's stated reason for sustaining the State's objection—"calls for a legal conclusion"—was wrong. "Calling for a legal conclusion" during witness examination applies when counsel asks the witness to make a judgment or determination on a legal issue rather than a factual one. To do so is inappropriate because the court makes legal conclusions, and when examining witnesses, counsel must focus on the relevant factual issues. Cf. *Puckett v. Mt. Carmel Regional Med. Center*, 290 Kan. 406, 445, 228 P.3d 1048 (2010) ("[I]t is generally recognized that testimony expressing a legal conclusion should ordinarily be excluded because such testimony is not the way in which a legal standard should be communicated to the jury."). Waldschmidt's intent on February 27, 2019, was not a legal determination; it was instead a factual statement relating to her mens rea at the time of the crime.

A defendant can testify about their own intent if relevant. See *United States v. Hayes*, 477 F.2d 868, 873 (10th Cir. 1973) ("Where a defendant's intent is in issue he should be permitted to testify as to his motive and actual intent or state of mind."); 23 C.J.S., Criminal Procedure and Rights of Accused § 1052 ("Generally, the defendant may testify directly as to the defendant's own uncommunicated intent or motive if it is material."). And whether Waldschmidt intended to put Gallaway "in fear or apprehension of bodily harm" was material and probative. See *Boleyn*, 297 Kan. 610, Syl. ¶ 1 ("Materiality addresses whether a fact has a legitimate and effective bearing on the decision of the case and is in dispute. Evidence is probative if it has any tendency in reason to prove a fact.").

Although the evidence was relevant to her intent and therefore admissible, we determine the solicited response was not essential to the defense's theory. Right after the court sustained the objection, this exchange occurred:

"[DEFENSE COUNSEL:] What was your intent in going to that parking lot?

"[WALDSCHMIDT:] To return his debit card.

. . . .

"[DEFENSE COUNSEL:] Had you any other intent that night other than to return the debit card?

"[WALDSCHMIDT:] No, I did not."

And during the State's cross-examination, the following exchange took place:

"[PROSECUTOR:] So in your direct exam you stated that you went over there to put—to give Diego Gallaway the debit card?

"[WALDSCHMIDT:] Yeah.

. . . .

"[PROSECUTOR:] Is that why you pulled into the back of that parking lot so that Ryan Thompson could whip [Gallaway]'s ass?

"[WALDSCHMIDT:] Absolutely not."

Waldschmidt forcefully made her point, so the excluded evidence solicited by the question was cumulative and redundant given what she testified to after the court

34

sustained the objection. The jury just did not believe her. We hold the district court did not violate Waldschmidt's fair trial right to present her defense theory.

## CUMULATIVE ERROR

To sum up, we have held the use-of-force instructions should have been given, although that omission did not amount to clear error, and that the prosecutor improperly bolstered the credibility of the State's witnesses and personally commented on Waldschmidt's testimony. But do all these circumstances get included in the cumulative error analysis Waldschmidt seeks? We hold they do not.

To explain, we begin with K.S.A. 2022 Supp. 22-3414(3):

"No party may assign as error the giving or failure to give an instruction, including a lesser included crime instruction, unless the party objects thereto before the jury retires to consider its verdict stating distinctly the matter to which the party objects and the grounds of the objection unless the instruction or the failure to give an instruction is clearly erroneous."

The statute presents an obvious question: How can an unpreserved instructional issue that is not clearly erroneous, like the one here on use-of-force instructions, become part of cumulative error when the statute's plain language declares no party may assign that matter as error? We can find no statutory support for doing so. See *State v. Moler*, 316 Kan. 565, 571, 519 P.3d 794 (2022) ("'[A] clear and unambiguous statute must be given effect as written.'"). And death penalty cases like *State v. Carr*, 314 Kan. 744, 777-78, 502 P.3d 511 (2022), *cert. denied* 143 S. Ct. 584 (2023), are instantly distinguishable because K.S.A. 2022 Supp. 21-6619(b) explicitly permits this court in capital cases to notice any "unassigned errors appearing of record if the ends of justice would be served thereby." Different still is the federal criminal code's plain error treatment. See Fed. R.

35

Crim. Proc. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention.").

To be sure, this court has at times—but without discussion—lumped unpreserved instructional issues into its cumulative error pot, even though very few resulted in conviction reversals. See, e.g., *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014); *State v. Castoreno*, 255 Kan. 401, 410-11, 874 P.2d 1173 (1994). Regardless, unreasoned judicial repetition does not create law when it directly conflicts with a statute.

The only hard look the court has taken at K.S.A. 2022 Supp. 22-3414(3) was more than 10 years ago in *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012). There, the court broadly considered subsection (3)'s effect on appellate analysis when a party raises an instructional error for the first time on appeal. The *Williams* court characterized the statutory language as "a *preservation rule* for instruction claims on appeal." (Emphasis added.) 295 Kan. 506, Syl. ¶ 3. And with that understanding, it said:

> "[W]e need to clarify just what the court must decide when presented with a claim of error for giving or failing to give an instruction that was not requested. As we noted earlier, the first step in the appellate process is normally a reviewability inquiry. Obviously, K.S.A. 22-3414(3) directly impacts that determination. Although it purports to withhold appellate jurisdiction in the absence of a proper objection, *the statute's exception effectively conveys such jurisdiction and preserves for appellate review any claim that the instruction error was clearly erroneous*." (Emphasis added.) 295 Kan. at 515.

*Williams* did not specifically address cumulative error, but the takeaway seems obvious from its preservation perspective:  the Legislature mandates that no party may claim as error the giving or failing to give an instruction unless (1) that party objects by stating a specific ground or (2) the instruction or failure to give an instruction is clearly

erroneous. And recall that clear error is a demanding standard. See *Williams*, 295 Kan. at 516 (to be clearly erroneous, reviewing court must be firmly convinced the jury would have reached a different verdict had the error not occurred). Said differently, the statute tells us unpreserved instructional issues are not error, unless they are determined to be clearly erroneous.

This is somewhat analogous to appeals about erroneously admitted evidence because we do not consider those unpreserved claims in a cumulative error analysis. K.S.A. 60-404 provides:

> "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless there appears of record objection to the evidence timely interposed and so stated as to make clear the specific ground of objection."

Of course, K.S.A. 60-404's plain language prevents an unpreserved evidentiary matter from contributing to the judgment's reversal, which is why we do not consider such matters collectively with other errors. Compare K.S.A. 60-404, with K.S.A. 2022 Supp. 21-6820(c) (providing "the appellate court shall not review" any sentence within the presumptive sentence for the crime or any sentence resulting from the parties' agreement). Similarly, when no clear error occurs with an unpreserved instructional issue, there is no error to aggregate.

Since we have not discussed this question before, it is difficult to understand how we stumbled into including unpreserved instructional matters that were not clearly erroneous with a cumulative error analysis in the first instance. But *Williams* suggests a possibility when the court noted:

37

"[T]o determine whether it was clearly erroneous to give or fail to give an instruction, *the reviewing court would necessarily have to first determine whether it was erroneous*. In other words, to determine whether the claim of error is properly reviewable, the court must first determine whether there is an error, *i.e.*, perform the merits review in the second step of the normal appellate process." (Emphasis added.) *Williams*, 295 Kan. at 515-16.

*Williams* explained the obvious—to decide whether an unpreserved instructional issue qualifies as clear judicial error under K.S.A. 2022 Supp. 22-3414(3), an appellate court must decide first whether there was even a mistake. Only then would a court take the next step to decide whether that mistake was serious enough to meet the demanding clearly erroneous standard. So after *Williams*, when it came time to do a cumulative error analysis in later cases, the court recited its typical boilerplate language describing cumulative error and just scooped up "all identified errors." See, e.g., *State v. Taylor*, 314 Kan. 166, Syl. ¶ 1, 496 P.3d 526 (2021):

"The test for cumulative error considers whether *all the identified errors* substantially prejudiced the defendant to the extent they affected the trial's outcome given the totality of the circumstances. To do this, an appellate court *examines all the errors in context*, considers how the district court dealt with them, reviews the nature and number of errors and whether they are connected, and then weighs the strength of the evidence." (Emphases added.)

In other words, we included unpreserved instructional issues that were not clearly erroneous when they merely passed the first step in the two-part test without considering K.S.A. 2022 Supp. 22-3414(3)'s limiting language. Worse yet, this practice increased the State's burden when these unpreserved instructional matters were included with other identified errors because cumulative error analysis places the burden on the State to show harmlessness. And if the cumulative error pot contained a constitutional error, the State's

38

burden increased further because it would have to prove harmless error beyond a reasonable doubt. See *Taylor*, 314 Kan. at 173.

To recap, we find no authority for our prior practice given the statutory restriction. We hold an unpreserved instructional issue that is not clearly erroneous cannot escape K.S.A. 2022 Supp. 22-3414(3)'s confines to be considered in a cumulative error analysis. It is simply not "error" for appellate review, even if we must characterize an unpreserved instructional issue as a "mistake" or an "error" under *Williams*' first step. 295 Kan. at 515-16. Our caselaw suggesting otherwise is disapproved. Here, this means the omitted use-of-force instructions cannot be part of Waldschmidt's cumulative error analysis.

Accordingly, we have two prosecutorial errors for cumulative error purposes, and we have already considered their collective impact. They did not deny Waldschmidt a fair trial beyond a reasonable doubt. No other analysis is needed because no error was found other than those prosecutorial issues. See *State v. Blevins*, 313 Kan. 413, 436-37, 485 P.3d 1175 (2021).

Affirmed.

* * *

WILSON, J., dissenting:  Like the majority, I find many aspects of Kylie Waldschmidt's conviction troubling. Unlike the majority, I can neither excuse the prosecutor's errors as harmless nor repudiate longstanding assumptions about our cumulative error analysis without the parties' input. Indeed, because I would find that the prosecutor's errors alone merit reversal, I would not reach the thorny cumulative error question the court has posed sua sponte. Therefore, I respectfully dissent.

39

*Merger*

I agree that Waldschmidt's "first" underlying act of aggravated assault did not merge with Gallaway's killing. But, in my view, the majority missteps in affirming the felony murder conviction based on the "first" underlying aggravated battery. (Like the majority, I use quotation marks in discussing the "first" and "second" aggravated battery and aggravated assault theories. While I cannot speak to the majority's intent, I do so to highlight what is, in my view, the specious nature of the distinction the State made between the "first" and "second" aggravated batteries for the first time in its brief on appeal.)

To begin, I see no evidence in the record that Thompson's use of a "headlock" constituted a deadly weapon. The majority latches on to the coroner's testimony about injury the coroner did *not* find—as if the coroner *did* find it—to conclude that the evidence "conflicts." Slip op. at 13-14. But there was no conflict here. While I am willing to assume without deciding that a person's own body could constitute a deadly weapon in some circumstances (should there be sufficient—nay, *any*—evidence to support such a claim), the State's failure to present any evidence of injury associated with the "headlock" renders this analysis unnecessary. See *State v. Clark*, 214 Kan. 293, 295, 521 P.2d 298, *opinion modified on denial of reh'g*, 215 Kan. 1, 522 P.2d 411 (1974). Instead, the majority embraces *hypothetical* testimony about what a "choke hold" *could* have inflicted—but, critically and clearly, *did not*—as sufficient. See slip op. at 21.

More importantly, nothing in the prosecutor's opening statements or closing arguments suggests that the jury would have been *aware* the State was relying on a "headlock" theory of aggravated battery as a predicate for its felony murder charge. Admittedly, as the majority notes, the State had espoused this theory at a pretrial hearing. Slip op. at 8. But so what? The jury, ostensibly the ultimate fact-finder here, heard none

of those arguments. All the jury heard was evidence *at trial* that Thompson briefly put Gallaway in a headlock while they were physically fighting for control of the gun and that Thompson touched the gun to the back of Gallaway's head before firing it. In describing the aggravated battery charge, the prosecutor *repeatedly* focused the jury's attention on the touching with the gun—*and never mentioned the headlock*. For instance, in opening statements, the prosecutor said:

> "The evidence will show that the defendant aided and abetted Ryan Thompson in this inherently dangerous felony of aggravated assault with a deadly weapon, and/or the evidence will show that she aided and abetted him in committing an aggravated battery by putting that gun—by allowing Thompson to put that gun to [Gallaway's] head."

Later, in closing arguments, the prosecutor said:

> "The intended crime is the agg assault, scare him with a weapon, show him this big gun, and scare him; agg assault.
>
> "Or use the gun, hold the gun up against him. That's an agg battery; the gun against him. Showing him the gun, touching him with the gun, scare the hell out of him. That was the crime, the intended, that was the crime they were carrying out.
>
> . . . .
>
> "On the agg battery, it's the same thing, did Ryan Thompson kill Diego Gallaway? Yes. Was he attempting or committing agg battery? Yes. *Agg battery is physical contact with Diego Gallaway with a deadly weapon*. We know it was a contact wound. *We know the gun had contact with him*. He also had bruising on his face and other cuts on his hands. We know the gun cut his finger. Diego Gallaway had contact with that gun when Ryan Thompson had the gun. *That's the agg battery*."

41

The prosecutor could not have been more clear about what *he* thought the act of aggravated battery was. I am thus puzzled by the majority's observation that it sees "nothing in the State's opening or closing statements expressly telling the jury to ignore the headlock or, more pointedly, to abandon the headlock as a predicate felony." Slip op. at 17. This is entirely beside the point. Of course the State never told the jury to "ignore" the headlock; it had never highlighted the headlock to the jury as the source of the predicate felony in the *first* place. Why would it make an "election" on a theory it had not spelled out? In billiards terms, the majority seems to be condoning what was effectively a slop shot by the prosecution. When the prosecution calls their pocket, as the prosecutor here *repeatedly* did by pointing to the act of touching Gallaway with the gun, they ought not to prevail on a mere fluke raised—for the first time since the pretrial hearings—in their appellate brief.

The majority also claims if "Waldschmidt intended to present a multiple acts issue or a functional election argument for the first time on appeal, her approach here is incorrect." Slip op. at 17. This criticism is misplaced. It was the State, in its responsive brief, who claimed there were two batteries. No matter what the State presented as theories in pretrial motions, Waldschmidt would have no reason to appeal a theory the State did not present to the jury. Did the State present evidence or argue that Thompson's arm was a deadly weapon? No. Did the State present evidence or argue that Thompson's headlock caused injury? No. The State did not just elect a theory in its opening statements or closing arguments. It presented no claim of aggravated battery based on the headlock; while the State certainly *mentioned* the headlock, as the majority points out, it only did so in describing the sequence of events—not in establishing the headlock *as* a deadly weapon. No deadly weapon, no injury, no cause of action. Thus, I would not fault Waldschmidt for crying foul "for the first time on appeal" when it was the *State* who put the headlock theory into play for the first time on appeal.

Thus, I would reverse Waldschmidt's conviction for felony murder based on the theory of Thompson's "first" aggravated battery—the headlock. This would still leave her with an alternative conviction for felony murder based on Thompson's "first" aggravated assault, but it might nevertheless affect the resulting analysis of other trial errors insofar as they only affect one or the other predicate felony theories.

*Prosecutorial Error*

While I agree with much of the majority's analysis of the prosecutor's errors, I depart from them in several critical ways—including the ultimate collective harmlessness of these errors.

First, I cannot agree that the impact of the prosecutor's bolstering comment "had to be minimal." Slip op. at 24. While the majority quotes a portion of the prosecutor's praise of law enforcement and correctly notes that it "occurred just once," that "just once" covered an entire page of transcript, while the prosecutor applauded each law enforcement officer *by name*. Slip op. at 24. This was a song, not a minor note in the prosecution's closing symphony.

Nor do I agree that this bolstering "was not part of a grander theme." Slip op. at 24. Indeed, the very next error the majority identifies, slip op. at 24, highlights the prosecutor's purpose in "'compliment[ing] law enforcement on their efforts'": the angle that Waldschmidt was a liar trying to "cover up" the crime and only the stalwart efforts of the police prevented her from getting away with it. The prosecutor may have only offered extended praise to law enforcement once, but it fit seamlessly into the overall theory of his case.

Likewise, I believe the majority cuts matters too finely in construing the prosecutor's erroneous comment that "[Waldschmidt] continues to try to cover *this* up." (Emphasis added.) The majority claims that "'this' plainly relates to specific statements attributed to her in a police interview report about the aggravated assault and aggravated battery." Slip op. at 24-25. But the prosecutor was not arguing that Waldschmidt was covering up some stray statements: he characterized "her true intent in this matter" as "to continue to cover up *the agg assault and the agg battery which resulted in the murder*" and framed her trial testimony as a continuation of that effort. (Emphasis added.) Slip op. at 24. Without Thompson's predicate crimes, Waldschmidt would not be facing a trial for felony murder. Thus, I struggle to see how the prosecutor's improper insinuation did not impugn "all" of Waldschmidt's trial testimony.

I further depart from the majority's treatment of the prosecutor's references to Thompson's "pistol" comment from the Facebook messages. The majority suggests that the prosecutor's closing arguments—which, among other things, insinuated that *Waldschmidt*, not Thompson, "had talked about . . . putting the gun down his throat"— can be excused as fair inferences based on Lieutenant Ridgway's testimony interpreting the Facebook comments. Slip op. at 27-28.

While I admit to some concern at the absence of a defense objection to the prosecutor's questions of a detective asking for his speculative interpretation of *someone else's* Facebook messages, I believe the majority goes too far to justify the prosecutor's remarks. Lieutenant Ridgway testified that his "understanding" of the immediate context of Thompson's "pistol" remark "would be the intention of causing harm to Mr. Gallaway." But Lieutenant Ridgway's "understanding" of the testimony was not based on anything other than what the jury already had before it: the plain text of the Facebook messages. Whatever else can be said about the eloquence of Thompson's writing, those messages were composed in plain English. Lieutenant Ridgway offered no specialized

44

knowledge of Thompson's vernacular and did not testify about messages not presented to the jury. The jury needed no translation of Thompson's meaning, and Lieutenant Ridgway gave them nothing beyond what they already had—except his uninformed and speculative opinion.

Even so, nothing Lieutenant Ridgway said justified the "inferences" the majority claims the prosecutor justifiably drew from Thompson's "pistol" comment. Even if *Thompson* was obliquely stating an intent to commit aggravated battery on Gallaway, the Facebook messages do not show that *Waldschmidt* did so. In each of the four at-issue comments, the prosecutor insinuated that *Waldschmidt*—either alone or as a component of "they"—made the "pistol" comment. But this was not an inference the prosecutor could make, either with or without Lieutenant Ridgway's testimony. It was a misstatement, and the prosecutor repeated it four separate times in increasingly distorted ways. In my view, this was error.

Unlike the majority, I would hold that the collective effect of the prosecutor's errors prejudiced Waldschmidt and required reversal of her conviction for felony murder. The prosecutor's bolstering of law enforcement put his own thumb on the scale to give their testimony extra weight to which they were not entitled. Building on the effect of the bolstering, the prosecutor again tilted the playing field when he opined that Waldschmidt could not be trusted to tell the truth even when she was under oath during trial, since she was simply furthering a "cover up." From there, the prosecutor's repeated mischaracterization of Thompson's stray "pistol" comment in the Facebook messages— which eventually all but put the comment in *Waldschmidt's* mouth—compounded the effect of the prosecutor's multiple errors.

Collectively, these errors effectively pigeonholed the jury into concluding, as the prosecutor argued, that the only possible motive Waldschmidt and Thompson could have

45

for going to Gallaway's apartment was to threaten Gallaway with a gun, whether simply by displaying the gun or by physically attacking him. But the evidence supporting this theory was far from overwhelming, particularly given the uncertainty about whether Waldschmidt even knew Thompson *had* a gun. In my view, there is a reasonable possibility that, but for these errors, the outcome of trial might have been different as to the felony murder charges. *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020). I would reverse Waldschmidt's conviction for felony murder.

*The District Court's Handling of an Objection to Waldschmidt's Testimony*

I next disagree with the majority's handling of Waldschmidt's claim that the district court denied her a right to a fair trial by refusing to permit her to testify about her intent. Defense counsel asked Waldschmidt, "Now, on February 27, 2019, did you intend to place Diego Gallaway in fear or apprehension of bodily harm?" The prosecutor objected on grounds of leading, which the district court sustained on the basis that the question called for a legal conclusion. Although the majority correctly holds that the question did *not* call for a legal conclusion and that "the evidence was relevant to [Waldschmidt's] intent and therefore admissible," it sanctions the district court's decision because "the solicited response was not essential to the defense's theory." Slip op. at 34. Instead, because the majority believes the evidence was "cumulative and redundant" in light of what Waldschmidt testified to *after* the district court's ruling, it affirms the district court as right for the wrong reasons. Slip op. at 34-35.

I find this approach troubling. In my view, the majority has transposed its analysis of *whether* the district court erred with its consideration of whether that error was harmless, i.e., whether the error *mattered*. I agree that the district court's error was harmless for the reason the majority sets forth: Waldschmidt was ultimately able to testify about her intent before the jury. But I cannot agree that the district court's ruling

46

was not error. The district court was not clairvoyant, and at the time it made the ruling the evidence was *not* cumulative; instead, defense counsel's question was proper and Waldschmidt should have been able to answer it. And while I agree that the error was harmless, it is yet one more error to consider in assessing cumulative error—my final disagreement with the majority.

*Cumulative Error*

The majority concludes that the district court should have sua sponte given the jury instructions on the use of force to defend another. Slip op. at 20. I agree. And I agree with the majority that this failure was not clearly erroneous. Slip op. at 21. Further, like me, the majority has found various other errors in Waldschmidt's trial, although we differ on their number and individual magnitude. Unlike the majority, however, I believe the cumulative effect of the prosecutor's errors warrants reversal of Waldschmidt's felony murder conviction even without considering the impact of other errors, such as the court's failure to sua sponte give use-of-force jury instructions.

But without seeking input from the parties, the majority takes it upon itself to address "an obvious question" in our cumulative error analysis: "How can an unpreserved instructional issue that is not clearly erroneous, like the one here on use-of-force instructions, become part of cumulative error when the statute's plain language declares no party may assign that matter as error?" Slip op. at 35. The majority then devotes several pages to answering its own question before ultimately concluding that "an unpreserved instructional issue that is not clearly erroneous cannot escape K.S.A. 2022 Supp. 22-3414(3)'s confines to be considered in a cumulative error analysis" and, indeed, "is simply not 'error' for appellate review." Slip op. at 39.

47

However sound the majority's analysis may be, it courts disaster by proceeding heedlessly into the land of statutory construction when it has not been asked to do so. Further, "when 'an appellate court raises a new issue sua sponte, counsel for all parties should be afforded a fair opportunity to brief the new issue and present their positions to the appellate court before the issue is finally determined.'" *Lumry v. State*, 305 Kan. 545, 566, 385 P.3d 479 (2016) (quoting *State v. Puckett*, 230 Kan. 596, 601, 640 P.2d 1198 [1982]). In repudiating decades of cumulative error analysis—however well-reasoned that repudiation and however deserving of repudiation that ostensible "unreasoned judicial repetition" may be—the majority does disservice to both the parties and future litigants by deciding the matter without offering anyone the chance to throw in their two cents first. Slip op. at 36. I would be curious to know what the parties would say about ignoring something not "clearly erroneous"—but also clearly not correct—when considering whether an accused has been afforded a fair trial, which is our standard of review when considering the impact of cumulative error. Thus, I would not so blithely disregard the constitutional implications with simple statutory construction.

Because I believe the prosecutor's errors denied Waldschmidt a fair trial and because I believe the majority dangerously oversteps itself in sua sponte reshaping our understanding of cumulative error, I respectfully dissent.