IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,241

STATE OF KANSAS,
*Appellee*,

v.

FRANCISCO ALEJANDRO MENDEZ,
*Appellant.*

SYLLABUS BY THE COURT

1.

When the property taken is a vehicle, an aggravated robbery conviction can be supported by a showing that the driver or any passengers would have remained in possession or control of the vehicle but for being overcome by violence or intimidation.

2.

K.S.A. 8-1729(e)—which provides that "[a]ll lighting devices and reflectors mounted on the rear of any vehicle shall display or reflect a red color"—requires that the light must display *only* a red color.

3.

Though it is prosecutorial error for the State to assert premeditation can be formed in one second, it is not error for the prosecutor to state that premeditation can be formed in five seconds, because five seconds can be enough time for an internal second thought or hesitation to arise.

1

Appeal from Shawnee District Court; CHERYL A. RIOS, judge. Oral argument held March 29, 2024. Opinion filed November 27, 2024. Affirmed in part and reversed in part.

*James M. Latta*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jodi Litfin*, deputy district attorney, argued the cause, and *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Francisco "Frankie" Alejandro Mendez was charged with various crimes after a days-long crime spree in Topeka where he and others stole a car from a driver and passenger at gunpoint; shot at Washburn partygoers, killing one; and robbed a group of people at gunpoint. A jury convicted him of one count of premeditated first-degree murder, four counts of attempted first-degree premeditated murder, and seven counts of aggravated robbery. Mendez directly appeals, raising nine claims of error. Today we reverse three of Mendez' aggravated robbery convictions and affirm all other convictions.

## FACTS AND PROCEDURAL BACKGROUND

Mendez' convictions arose out of three separate events that spanned several days in April 2019.

On the evening of April 27, 2019, Lindsay Koch picked up Will Clark in her 2016 white Chevy Cruze to go buy marijuana. Koch picked up Clark from his house, went to make the purchase, and returned to Clark's house. As Koch pulled into Clark's driveway, they saw three men standing by Clark's garage who Clark did not recognize.

2

The men quickly flanked the sides of Koch's car. One of the men asked, "Where's the money at?" Mendez, holding a revolver on Koch's side of the car, demanded that she get out. Koch refused. Mendez hit her window with the revolver, and it fired off a round. On the passenger side, one of the men shouted "Get him," at which point Clark burst out of the car, pushed the men out of his way, and ran inside the house to retrieve his own gun.

While Clark was inside, Koch got out of the car with her cell phone in hand. Koch's purse and wallet remained in the car. Mendez told Koch to toss her phone back inside the car and to lie on the ground. Koch threw her phone back into the car, but she refused to lie down. Mendez kept his gun trained on her while he and his comrades got into her car and drove away. After they drove away Koch ran to a nearby Walgreens to call 911. By the time Clark came back outside, everyone was gone, and he met up with Koch at Walgreens where they spoke with police.

Law enforcement found Koch's car a day later in a parking lot. A cigarillo butt and wrapper were retrieved from the middle console area that had DNA on it consistent with Mendez' DNA.

On the evening of the carjacking, students at Washburn University threw a house party. Party guests included Washburn football players Corey Ballentine, Dwane Simmons, Channon Ross, Kevin Neal, and James Letcher Jr. Many of the partygoers were celebrating Ballentine's draft into the NFL earlier that day.

Around 1 a.m., Ballentine, Simmons, Ross, Neal, and Letcher made their way outside and were getting ready to leave. They were standing near the street talking to one another when Koch's stolen white Chevy Cruze pulled up to them, with Mendez at the wheel. Three or four other men were inside the car.

3

One of the men in the car asked the group of football players if they had any marijuana. The group responded that they did not. One of the men then asked, "What's y'all names?" One of the football players told the men to not worry about their names.

The car then began to drive away, and the football players resumed their conversation. Moments later the car screeched to a halt, and the men in the car began shooting at the football players. One partygoer witness later said that he saw the men getting out of the car as they turned back to shoot into the group.

Witnesses described the shots sounding "slow" at first but then started "picking up." The football players and other witnesses at the party heard at least a dozen or more shots. The car then sped off.

Once the gunshots began, the victims scattered. Ballentine turned and ran and got shot in the backside while he was running away. Neal ran and hid behind a nearby car. Ross ran back to his nearby apartment that he shared with Letcher and Neal. Letcher and Neal initially ducked behind cars but then also made it back to their apartment after the shooting stopped. Ross called Ballentine, who answered and told Ross that he had been shot. Ross picked Ballentine up and took him to the hospital, where doctors discovered that Ballentine's pelvic bone was fractured. The bullet was never recovered from his pelvis because doctors determined that removing it would have caused more damage.

Ross also called Simmons, who did not answer. Simmons had been fatally shot in the head. The bullet that law enforcement eventually collected from Simmons' head was from a Colt revolver.

Eighteen shell casings from three different semiautomatic guns were found at the scene. Since a revolver does not automatically eject shell casings, no shell casings from a revolver were found. No guns were found at the scene.

4

Two evenings after the shooting at the Washburn party, Kathy Cool drove Vladimir Stryka, Demetrius Hodge, Dmitri Farafontoff, and Lisa Hicks from Lawrence to Topeka to hang out. Hicks, who was nearly five months pregnant, was in the front passenger seat, and the three men were in the backseat. The group eventually went to Central Park to meet some friends of Hodge.

Cool pulled into a parking spot. A few minutes later a white four-door Nissan Altima pulled up behind them, containing Mendez and three other men. Hodge and Farafontoff got out to talk to Mendez, who Hodge knew. Everyone else stayed in the car.

Suddenly and without provocation, Mendez and his comrades pulled guns, pistol whipped Farafontoff, and got Farafontoff and Hodge to the ground. One of the men put a gun in Stryka's face and told him to give him everything in his pockets. Stryka told him "to get the gun the fuck out of [his] face," and the man hit him with the gun. Stryka had his own wallet and Hicks' wallet on him, and the man took both wallets from Stryka after striking him with the firearm. That same man then put his gun in Hicks' face and told Hicks to shut her mouth. He told Hicks he would shoot her if she did not shut up. He also demanded Hicks give him her phone, and Hicks complied.

Mendez, armed with a revolver, approached the driver's side where Cool was sitting. Mendez shouted at Cool to give him her phone, but she refused. Mendez told Cool, "One more time, if you don't give me the phone, I'm going to shoot you in the face you fat bitch." Cool again refused. Mendez then shot the gun through her window. The window shattered, and the bullet hit the steering wheel, then bounced off and hit the dash, and then landed in the passenger seat next to Hicks. The victims heard someone say "Frankie, come on." Mendez and the men rushed back into their car and drove off.

Based on these three events, the State charged Mendez with the premeditated first-degree murder of Simmons, the attempted first-degree premeditated murder of Ballentine, Neal, Ross, and Letcher, and the aggravated robbery of Koch, Clark, Cool, Hicks, Stryka, Hodge, and Farafontoff.

During the ensuing investigation, law enforcement learned that Mendez had been a passenger in a traffic stop two weeks prior to these events. During that stop, police found a revolver in the backseat, and Mendez told the officers that it was his and that he had recently bought it off the street. After completing the stop, the officers put the gun in the trunk of the car and released it back to Mendez.

That same firearm, a Colt Trooper .38 caliber revolver, was eventually recovered over a year later at a firearm dealer's home in Topeka. The dealer had killed himself by accidentally discharging a firearm, and while responding to the scene law enforcement found a bundle of firearms under his bed which included the revolver. Police test fired that gun and concluded it was the same gun that killed Dwane Simmons as well as the gun that was fired into Cool's car in Central Park.

After Mendez was arrested, he called his brother from jail and they discussed how police had searched their house. His brother told Mendez that law enforcement "didn't find my thing." Mendez' brother then asked Mendez, "Where's your shit at?" Mendez responded, "Don't worry about it," and said that it was not there. Police believed that Mendez was referring to his revolver.

A jury ultimately convicted Mendez of the premeditated first-degree murder of Simmons, the attempted premeditated first-degree murder of Ballentine, Neal, Ross, and Letcher, and the aggravated robbery of Koch, Clark, Cool, Hicks, Stryka, Hodge, and Farafontoff. The district court sentenced Mendez to a hard 50 life sentence plus 492 months in prison. Mendez directly appeals.

DISCUSSION

Mendez raises nine claims of error: (1) the evidence of premeditation was insufficient; (2) the aiding and abetting instruction was clearly erroneous; (3) pre-meditated first-degree murder is unconstitutionally vague; (4) sufficient evidence does not support the aggravated robbery convictions of victims who had nothing taken from them; (5) the aggravated robbery convictions are multiplicitous; (6) the district court erred in denying the motion to suppress; (7) the State committed reversible prosecutorial error; (8) the instruction of "knowingly" in the aggravated robbery instruction was clearly erroneous; and (9) cumulative error deprived Mendez of a fair trial. We address each in turn.

*Sufficient evidence supports a finding of premeditation.*

When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "[E]ven the gravest offense can be based entirely on circumstantial evidence. Sufficient circumstantial evidence does not need to exclude every other reasonable conclusion to support a conviction. [Citations omitted.]" *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022); see also *State v. Phillips*, 299 Kan. 479, 498, 325 P.3d 1095 (2014) ("[I]t is not necessary that there be direct evidence of either intent or premeditation. Instead, premeditation, deliberation, and intent may be inferred from the established circumstances of a case, provided the inferences are reasonable.").

"Both intent and premeditation may be inferred from circumstantial evidence. Juries presume a person intends all the natural consequences of his or her acts." *State v. Frantz*, 316 Kan. 708, 741, 521 P.3d 1113 (2022). We have identified nonexclusive factors to consider in determining whether circumstantial evidence gives rise to an inference of premeditation. These factors include the: (1) nature of the weapon used; (2) lack of provocation; (3) defendant's conduct before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) dealing of lethal blows after the victim was rendered helpless. The number of factors present does not affect the analysis of what inferences can be reasonably drawn, because in some cases one factor alone may be compelling evidence of premeditation. However, use of a deadly weapon by itself is insufficient to establish premeditation. *State v. Killings*, 301 Kan. 214, Syl. ¶ 3, 340 P.3d 1186 (2015).

First, we are not persuaded by Mendez' argument that there was not enough time from the "disrespect" of the football players saying not to worry about their names to the shooting to have formed premeditation. In *State v. Stanley*, 312 Kan. 557, 572-73, 478 P.3d 324 (2020), we discussed how the hallmark of premeditation is the internal "'second thought'" or the time it takes for a "'hesitation'" to arise. "The temporal space required to complete that process may be very short—a mere hesitation, perhaps, as . . . I complete the internal double-check." 312 Kan. at 573.

The evidence showed there was sufficient time for Mendez to have had an internal second thought or hesitation arise and complete a "double-check." The victims testified that it was maybe 10 to 15 seconds after the car started pulling away before it stopped and gunfire began. They agreed it was not as long as "minutes" later, but it certainly was not instantaneous given that the car first pulled away and the victims had time enough to go "back to talking . . . to each other" before they were shot at. Ten to fifteen seconds is enough time for Mendez to have had an "internal second thought" before stopping the car, looking back, and firing.

Moreover, to the extent Mendez argues that driving a car is such a cognitively challenging, all-consuming activity so as to prevent him from being mentally capable of forming premeditation, that same fact, when viewed in the light most favorable to the State, actually favors a finding of premeditation. Mendez would have had to decide to continue driving the car after the initial encounter, then make the decision to stop the car, pull his gun, turn, and begin shooting. The shooting does not appear to be the kind of "internal, snap decision" that was made on "'impulse'" without any "cognitive moment of reflection or pondering" which would show a lack of premeditation as we contemplated in *Stanley*, 312 Kan. at 572.

Furthermore, though the time between the initial encounter and the gunfire was short, the shooting itself lasted several minutes. Evidence showed that the shooters fired well over a dozen shots. The shooting involved 3 different guns, with 18 shell casings found at the scene. See *Frantz*, 316 Kan. at 741 (shooting victim six times supported inference of premeditation); *State v. Salary*, 301 Kan. 586, 601, 343 P.3d 1165 (2015) (shooting victim multiple times supported inference of premeditation). What is more, the shooting started off slowly at first, then started picking up speed. Letcher testified that after "the first shot there was little pause . . . [a]nd then multiple shots were followed by that." Ballentine similarly testified that the shots sounded "slow," and "then about halfway through it started, like, picking up." See *Frantz*, 316 Kan. at 741 ("Witnesses heard several shots, a pause, and then more shots."); *State v. Cosby*, 293 Kan. 121, 134-35, 262 P.3d 285 (2011) (finding evidence supporting premeditation included the defendant firing multiple shots with a pause between the first and second shot).

As soon as the shooting started, the football players ran. Ballentine was already running and had nearly made it to the street corner before he was shot in the backside, and even then, the shots continued until after he got around the corner. Similarly, Neal stated it felt like the gunfire lasted "forever," even though in reality it was more like "a

9

couple minutes." While the shooting was occurring, Neal "laid[] parallel underneath [a] car." Ross gave similar testimony; he stated that after the first shot, he took off running, and that there were "a lot more [shots fired] while [he] was running." These facts show that the shooters continued to fire at the football players for potentially several minutes as they were fleeing from the scene.

Moreover, the victims did not provoke the shooters. The football players were all outside getting ready to leave the party when Mendez pulled up to them. Someone in the car asked if they had any weed, and the group responded "no." One of the men inside the car asked their names, and one of the football players told the men to not worry about their names. The car then pulled away, but stopped and then the shooting began. As the State argues, refusing to tell a car full of strangers your name after they pull up at 1 a.m. and ask for weed is not provocation to be shot. The victims agreed that the exchange was not "heated" or "angry" and there were no threats made during the brief encounter. See *State v. Pabst*, 268 Kan. 501, 513, 996 P.2d 321 (2000) (finding sufficient evidence of premeditation in part because although defendant and victim were engaged in a "mild, nonviolent argument," defendant was not provoked).

Additionally, firearms were used to commit the murder and attempted murders, with the fatal bullet coming from Mendez' revolver. And finally, Mendez' conduct after the shooting also supports a finding of premeditation. Once the men stopped shooting, they fled the scene and did not attempt to call for or render aid. See *Frantz*, 316 Kan. at 741-42 (fleeing scene without calling for or rendering aid could support inference of premeditation); *State v. Carter*, 305 Kan. 139, 153, 380 P.3d 189 (2016) ("[A] defendant's conduct after a killing indicative of earlier premeditation has included failure to seek medical attention for the victim.").

Mendez was "free to argue to the jury that the circumstantial nature of much of the evidence created reasonable doubt, but on appeal we accept the circumstantial evidence

10

in the light most favorable to the State when assessing sufficiency." *State v. Ward*, 292 Kan. 541, 581-82, 256 P.3d 801 (2011). Mendez' jury was given options for premeditated first-degree as well as second-degree intentional murder, second-degree reckless murder, and involuntary manslaughter for the murder of Simmons, and the attempted version of each of those crimes with respect to the remaining four victims. The district court also specifically instructed the jury that if there was a "reasonable doubt as to which of two or more offenses defendant is guilty, he may be convicted of the lesser offense only, provided the lesser offense has been proven beyond a reasonable doubt." To reach the result Mendez requests, we would have to make our own credibility determinations and reweigh the evidence, but these are not tasks an appellate court performs when conducting a sufficiency review. Instead, we consider all evidence—even if there is conflicting evidence or reasons to question its credibility—and do so in the light most favorable to the State. *Phillips*, 299 Kan. at 500-01. Viewing the evidence in a light most favorable to the State, we conclude that the evidence establishing premeditation is sufficient.

*The aiding and abetting instruction was not clearly erroneous.*

The district court provided the aiding and abetting jury instruction at the State's request, and without defense objection. That instruction read in pertinent part:

> "A person is criminally responsible for a crime committed by another if the person, either before or during its commission, and with the mental culpability required to commit the crime, intentionally aids the other person to commit the crime.
>
> "The person who is responsible for a crime committed by another is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the person could reasonably foresee the other crime as a probable consequence of committing or attempting to commit the intended crime."

11

The district court then instructed the jury on the elements of the substantive offenses: first-degree premeditated murder, attempted first-degree premeditated murder, and aggravated robbery, as well as the lesser included offenses of second-degree intentional murder, second-degree reckless murder, involuntary manslaughter, attempted second-degree intentional murder, attempted second-degree reckless murder, and attempted involuntary manslaughter.

When analyzing jury instruction issues on appeal, appellate courts follow a three-step process: (1) determining whether the issue is preserved for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

At the second step, we consider whether the instruction was both legally and factually appropriate, using an unlimited standard of review of the entire record. In determining whether an instruction was factually appropriate, we must determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, that would have supported the instruction. 313 Kan. at 254-55.

When, as here, a party fails to object to a jury instruction before the district court, we review the instruction to determine if it was clearly erroneous. K.S.A. 22-3414. For a jury instruction to be clearly erroneous, the instruction must be legally or factually inappropriate and the court must be firmly convinced the jury would have reached a different verdict if the erroneous instruction had not been given. The party claiming clear error has the burden to show both error and prejudice. *State v. Crosby*, 312 Kan. 630, 639, 479 P.3d 167 (2021).

12

Mendez contends the aiding and abetting instruction—particularly the portion regarding foreseeability—improperly lowered the State's burden of proof on the specific intent crimes with which he was charged. He is correct that given the set of crimes charged in his case, this instruction was erroneous.

In *State v. Engelhardt*, the defendant was convicted of premeditated first-degree murder under an aiding and abetting theory after he and an accomplice stabbed the victim multiple times. 280 Kan. 113, 115, 131-34, 119 P.3d 1148 (2005). He argued that the foreseeability instruction impermissibly lowered the State's burden of proof on the element of intent, since the instruction stated that the prosecution only had to show that the murder was a foreseeable consequence of another criminal act—not that it was premeditated. This court agreed that the instruction negated the intent element of premeditated murder and was confusing because he was also charged with other counts such as kidnapping, criminal threat, and battery. 280 Kan. at 132-33. Though the instruction in that case was error, the court held it was harmless because the evidence against Engelhardt was overwhelming. 280 Kan. at 133-34.

We reaffirmed this holding in *State v. Overstreet*, 288 Kan. 1, 9, 200 P.3d 427 (2009). Overstreet was charged with attempted premeditated first-degree murder and aggravated assault under an aiding and abetting theory after he drove a vehicle involved in a drive-by shooting. We declared that "*Engelhardt* makes it clear that to be successful on this theory, the State was required to prove that the defendant shared in the specific intent of premeditation and thus promoted or assisted in the commission of the specific crime of premeditated first-degree murder." 288 Kan. at 11. Yet by giving the foreseeability instruction, the district court diminished the State's burden because it indicated to the jurors that they "need not find that Overstreet possessed the specific intent of premeditation if it found that premeditated murder was a reasonably foreseeable consequence of aggravated assault," and "the fact that it may be foreseeable that someone

13

may die as a result of a particular course of action does not give rise to the conclusion that the cause of death was premeditated." 288 Kan. at 11-12.

And recently in *State v. Gonzalez*, 311 Kan. 281, 460 P.3d 348 (2020), the defendant was convicted of felony murder, attempted aggravated robbery, and conspiracy to commit aggravated robbery after a passenger in a car he was driving shot and killed a man. This court once again declared that the instruction was legally inappropriate as given because its use must be limited when defendants are charged with aiding and abetting specific intent crimes. 311 Kan. at 291.

Though we agree with Mendez that the instruction was legally inappropriate, we conclude the foreseeability instruction was not clearly erroneous.

In Mendez' case, the main charges relating to the murder and attempted murders require a finding of specific intent, as did some of the lesser included offenses. See *Overstreet*, 288 Kan. at 11 (premeditated first-degree murder is a specific intent crime); *State v. Mora*, 315 Kan. 537, 543, 509 P.3d 1201 (2022) (any form of "attempted" crime requires specific intent); *State v. Deal*, 293 Kan. 872, 883, 269 P.3d 1282 (2012) (intentional second-degree murder is a specific intent crime). Yet the aggravated robberies require general intent as they needed only to be committed "knowingly." See K.S.A. 21-5202(i) (any crime with a "knowingly" mens rea is a general intent crime). So, Mendez argues that the instructions failed to "inform the jury which of the crimes submitted to it for deliberation was an 'intended' crime and which might have been the 'other crime' committed while carrying out the intended crime." *Gonzalez*, 311 Kan. at 293.

The crimes for which Mendez was charged spanned several days, and included three distinct sets of criminal acts that were physically and temporally separated. The first was the aggravated robbery of Koch and Clark; the second—approximately four hours

14

later at a different location—was the murder and attempted murders of the Washburn football players; and the third was the Central Park aggravated robbery two days later. Significantly, the murder and attempted murders at the Washburn party did not involve a robbery. The only specific intent crimes that Mendez was charged with arose from that encounter, and the only crimes charged based on that encounter were the murder and attempted murders—both specific intent crimes.

Given the separation of the three criminal acts, the aiding and abetting instruction would not have confused the jurors and made them think they could convict Mendez of premeditated murder if the murder was a reasonably foreseeable consequence of the aggravated robberies. This is especially true considering that the prosecutor was clear in making this temporal distinction between the three crimes when discussing the aiding and abetting instruction. Mendez' case is thus inapposite to *Overstreet*, where we found clear error because there was "a real possibility that the jury, following this [foreseeability] instruction . . . convicted Overstreet of the attempted premeditated murder not because the defendant aided or abetted in the attempted premeditated murder *but because the murder was a reasonably foreseeable consequence of the aggravated assault*." (Emphasis added.) 288 Kan. at 14-15. But here, there is no such "real possibility" that the jury convicted Mendez of the murder and attempted murders only because it found them to be a reasonably foreseeable consequence of the aggravated robberies that occurred at different times and places. As such, Mendez has not met his burden of convincing this court that the instruction was clear error.

*We decline to reach Mendez' challenge to the constitutionality of premeditated first-degree murder.*

Mendez acknowledges he did not raise this issue below. We generally do not address legal theories raised for the first time on appeal, even those of constitutional dimension. *State v. Gutierrez-Fuentes*, 315 Kan. 341, 347, 508 P.3d 378 (2022). A

defendant may however persuade us to review the new issue by invoking one of our three exceptions to the general preservation rule. Mendez invokes two such exceptions, arguing that this issue presents only a question of law on admitted facts, and that consideration of the theory is necessary to serve the ends of justice and prevent a denial of fundamental rights. See *Phillips*, 299 Kan. at 493. Nevertheless, our review is prudential, and even if an exception may apply, we may still decline to review the question. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020) ("Even if an exception would support a decision to review a new claim, we have no obligation to do so."). We decline Mendez' invitation to review this new claim for the first time on appeal.

*We reverse three of Mendez' convictions for aggravated robbery as they are not supported by sufficient evidence.*

Aggravated robbery is "knowingly *taking property* from the person or presence of another by force or by threat of bodily harm to any person . . . when committed by a person who . . . [i]s armed with a dangerous weapon[.]" (Emphasis added.) K.S.A. 21-5420(a), (b)(1). An essential element of this crime is that property was taken from the victim's person or presence. Mendez argues that his convictions for aggravated robbery with respect to Clark, Cool, Hodge, and Farafontoff must be reversed because none of those four individuals had anything taken from them, and so they never had possession or control so immediate of any of the stolen property that force or fear was needed to get them to give it up.

This issue is governed by the same standard of review set forth above. We review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. *Aguirre*, 313 Kan. at 209.

16

First, with respect to the carjacking, Mendez argues that Clark, as a passenger, never had possession or control so immediate of Koch's car that force or fear was needed to get him to give up the property. The State disagrees, arguing that the car was taken in the presence of both Koch and Clark. Specifically, the State points out that Clark was forced out of the car by armed men: "Had Clark not been overcome by violence, he would have remained in Koch's car and retained possession of it."

We agree that even as a passenger, Clark did have some degree of possession and control of Koch's car, because "'violence or intimidation [was] essential to sunder it.'" *State v. Dale*, 312 Kan. 174, 189, 474 P.3d 291 (2020). Clark was an invited guest of Koch, was seated in the passenger seat, and had he not been "overcome by violence" or intimidation, he could have remained in the car. We reject Mendez' notion that in a carjacking, the driver/owner of the vehicle is the only individual that can legally be said to be the victim. Rather, K.S.A. 21-5420 permits the State to obtain a conviction for aggravated robbery if it can prove that any person—driver or passenger—in the vehicle was forced out "by force or by threat of bodily harm" by a person "armed with a dangerous weapon." K.S.A. 21-5420(a), (b)(1). We thus affirm Mendez' conviction for aggravated robbery with respect to Clark.

With respect to the Central Park robbery, the State agrees that Cool did not have anything taken from her person, and therefore does not dispute that Mendez' conviction for the aggravated robbery of Cool is reversible as it is not supported by sufficient evidence. But the State insists that Hodge and Farafontoff did have items taken from their possession. The State relies on Stryka's testimony that "as far as [he] knew, [Hodge], he got his pockets ran, so did [Farafontoff]." The State suggests getting one's "pockets ran" is a street colloquialism for having the contents of one's pockets stolen. This may be true, however, it remains unproven that Hodge had any items in his pockets to begin with. The State also points to Cool's testimony that she saw Mendez and his comrades demanding

17

money from others and "picking pockets on other people to see what they had." According to the State, "[t]his evidence establishes that Hodge and Farafontoff had property taken from their person."

We disagree. This testimony does not establish that any items were actually taken from Hodge or Farafontoff. Unlike the other victims, no evidence was shown that those two gave up their wallets, phones, cash, or anything at all. Stryka testified that he did not see any items get taken from Hodge and Farafontoff. And neither Hodge nor Farafontoff testified at trial. Though their testimony is not specifically necessary to support the convictions, the State must have presented *some* evidence that property was removed from their person or presence, as the "taking" of "property" is an essential element of the crime of aggravated robbery. K.S.A. 21-5420.

All the elements of robbery must be proven to obtain a conviction of completed aggravated robbery. That did not happen here with respect to Cool, Hodge, and Farafontoff. As such, Mendez' aggravated robbery convictions with respect to these three victims must be reversed.

Because we reverse Mendez' convictions with respect to Cool, Hodge, and Farafontoff as lacking sufficient evidence, we need not consider Mendez' alternative arguments that those convictions are multiplicitous. See *State v. Keyes*, 312 Kan. 103, 111, 472 P.3d 78 (2020) (declining to reach further claims of error after identifying reversible error; "[t]o do so would be to render an advisory opinion").

*Mendez' conviction for aggravated robbery with respect to Clark is not multiplicitous.*

As above, Mendez acknowledges he did not raise this issue below, but asks us to review it under the first and second preservation exceptions. Once again, we may decline to do so. *Gray*, 311 Kan. at 170. We will proceed to consider the claim under the

18

exceptions Mendez asserts. In so doing, we exercise unlimited review, as this presents a question of law regarding whether a conviction violates the Double Jeopardy Clause. *Dale*, 312 Kan. at 178.

"[T]he Double Jeopardy Clause of the Fifth Amendment 'protects against: (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense.'" 312 Kan. at 178. Mendez asserts that his aggravated robbery convictions fall within the third category. This category only applies if the crimes arise from the "same offense." "Determining whether the State has charged a defendant with multiple counts of the same offense requires a multilayered analysis." 312 Kan. at 178.

The first layer requires examining whether the charges arise from "'discrete and separate acts or courses of conduct' or unitary conduct arising from 'the same act or transaction' or a 'single course of conduct.' Double jeopardy concerns arise only if unitary conduct is at issue." 312 Kan. at 178. Mendez claims that the carjacking of Koch and Clark constitutes an instance of "unitary conduct." The State agrees with Mendez on this point, as the acts occurred at the same time and location, there was no intervening event, and there was no fresh impulse motivating some of the conduct. See 312 Kan. at 179.

At the second layer of the analysis, when the charges arise from the same statute (as they do here), we determine whether there are two offenses or only one based on the statutory definition. To do so we utilize the "unit of prosecution" test.

> "Under that test, 'the statutory definition of the crime determines what the legislature intended as the allowable unit of prosecution. There can be only one conviction for each allowable unit of prosecution. The determination of the appropriate unit of prosecution is not necessarily dependent upon whether there is a single physical action or a single victim. Rather, the key is the nature of the conduct proscribed.' [Citations omitted.]" 312 Kan. at 184.

19

We therefore must determine the allowable unit of prosecution for aggravated robbery.

Aggravated robbery is "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person . . . when committed by a person who . . . [i]s armed with a dangerous weapon[.]" K.S.A. 21-5420(a), (b)(1). *Dale* employed the unit of prosecution test for aggravated robbery, and both Mendez and the State claim that *Dale* supports their respective positions.

In *Dale*, the defendant and his co-defendant approached three skateboarders at a park. Two of the skateboarders were sitting beside a pile of belongings that included the cell phones of all three skateboarders. The third skateboarder was skateboarding about 20 to 30 feet away while wearing headphones. Dale pulled a BB gun on the two seated skateboarders, and during the altercation physically assaulted them both—grabbing them, pressing the gun against them, and hitting them with the gun while Dale's co-defendant grabbed the phones. Based on these events, the State charged Dale with the aggravated robbery of the two skateboarders' cell phones and the theft of the third skateboarder's cell phone. 312 Kan. at 175-76.

This court held that the convictions were not multiplicitous, because despite Dale's aggravated robbery convictions arising from unitary conduct, that conduct involved two victims, each of whom had a claim to the control and possession of their property that Dale stole from them at gunpoint. 312 Kan. 174, Syl. ¶ 2.

> "'The general rule is that "presence," as that word is used in defining robbery, means a possession or control so immediate that violence or intimidation is essential to sunder it. . . . . A thing is in the presence of a person with respect to robbery, which is so within his control that he could, if not overcome by violence or prevented by fear, retain his possession of it.'" 312 Kan. at 189.

Mendez asserts that, unlike Dale, Clark never had possession or control so immediate of the car that force or fear was needed to get him to give up the property. The State disagrees, arguing that the car was taken in the presence of both victims, and that Clark was forced out of the car by armed men. The State argues that the unit of prosecution for an aggravated robbery is not focused on the ownership of the property taken; rather, the focus is on the individual from whose presence property is taken.

As discussed in the preceding issue, Clark, as a passenger, did have legal possession and control of Koch's car because his possession or control was "'so immediate that violence or intimidation [was] essential to sunder it.'" 312 Kan. at 189. As we described above, Clark was a guest of Koch, seated in the passenger seat, and had he not been "overcome by violence" or intimidation, he could have remained in the car. Mendez' conviction on this count is not multiplicitous.

*The district court did not err in denying the motion to suppress.*

The United States Constitution under the Fourth Amendment

"guarantees '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures,' and a traffic stop is considered a seizure . . . . Compliance with the Fourth Amendment requires the officer conducting the stop to 'have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime.'" *State v. Sharp*, 305 Kan. 1076, 1081, 390 P.3d 542 (2017).

A traffic violation provides an objectively valid reason to effectuate a traffic stop, even if the stop is pretextual. *State v. Jones*, 300 Kan. 630, 638, 333 P.3d 886 (2014).

In reviewing a district court's decision on a motion to suppress, we review the factual underpinnings of the decision by a substantial, competent evidence standard and the ultimate legal conclusion by a de novo standard. When, as here, the material facts supporting a district court's decision are not in dispute, the ultimate question of whether to suppress is a question of law over which we exercise unlimited review. When applying this standard, we do not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *State v. Hanke*, 307 Kan. 823, 827, 415 P.3d 966 (2018). To the extent that we must engage in statutory interpretation to resolve this question, this likewise presents a question of law subject to unlimited review. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

Sheriff's deputies stopped the car in which Mendez was a passenger because the deputies believed the car's rear passenger light violated K.S.A. 8-1729(e), which provides:

"All lighting devices and reflectors mounted on the rear of any vehicle shall display or reflect a red color, except the stop light or other signal device, which may be red, amber or yellow, and except that the light illuminating the license plate shall be white and the light emitted by a back-up lamp shall be white or amber."

The deputies believed this statute meant that only red light can be emitted from the rear light. Because they saw white light in the rear passenger light, they effectuated a traffic stop. The district court, after viewing the evidence presented at the suppression hearing, agreed with the officers that because a white light was apparent from the right rear taillight, they had reasonable suspicion that the car was in violation of K.S.A. 8-1729(e).

Mendez contends there was no violation of K.S.A. 8-1729(e) because that statute merely requires *some* red light to be displayed from a rear taillight and does not require

*only* red light be displayed. Mendez asserts that because the evidence showed some red light from the rear taillight, there was no violation, and the officers lacked authority to initiate the stop.

We are unpersuaded by Mendez' argument. The statute provides that "[a]ll lighting devices . . . shall display . . . a red color." While Mendez appears to argue that the light does not need to be exclusively red—and that the statute could be read to mean the light "shall display a red color in addition to other colors"—that is an unreasonable reading of the statute, because that would indicate that a person could put just any color back there as long as there was some red in it. But the statute's directive that "all" lighting devices must display red forecloses Mendez' argument.

Moreover, K.S.A. 8-1729(e) makes an explicit exception for the stop light or signal device, which it says "*may* be red, amber or yellow." (Emphasis added.) In other words, K.S.A. 8-1729(e) gives opportunity for certain, specific lights to have a different—but still specified—color, whereas "all" remaining lights "shall" be "red," with no exceptions provided. As such, the district court did not err in denying Mendez' motion to suppress.

*The State did not commit reversible prosecutorial error.*

In closing argument, the State asserted:

> "And that is all it takes to form premeditation if the evidence supports it. To have thought the matter over beforehand and then acted on it, that's what premeditation is. It can be a second. It could be five seconds. It could be two weeks of premeditation. The evidence has to support that the defendant thought the matter over beforehand and then acted on it, just as that instruction tells you."

23

Mendez argues it was error for the State to claim that premeditation could be formed in one second or five seconds.

We employ a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Mendez did not object to any of the errors he now complains of on appeal. Yet we will review claims of prosecutorial error made in closing argument even in the absence of a contemporaneous objection. But the presence or absence of an objection can be factored into our analysis of an alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Our first step in analyzing a claim of prosecutorial error is to decide whether the prosecutor's comments were outside the wide latitude allowed in discussing the evidence. A defendant meets the first prong by establishing the prosecutor misstated the law or argued a fact or factual inferences outside of what the evidence showed. *State v. Ballou*, 310 Kan. 591, 596, 448 P.3d 479 (2019). In determining whether a particular statement

falls outside of the wide latitude given to prosecutors, we consider the context in which the statement was made, rather than analyzing the statement in isolation. *State v. Becker*, 311 Kan. 176, 182, 459 P.3d 173 (2020).

The State agrees it was error to claim premeditation could be formed in one second. And indeed, our precedent is clear on that point. See, e.g., *Phillips*, 299 Kan. at 504-05 (finding prosecutorial error based on prosecutor's statement that premeditation could be formed in a "half second," because "this court has repeatedly warned prosecutors about . . . making comments that are analogous to stating premeditation can occur in the same instant as the act that results in a death"); *State v. Kettler*, 299 Kan. 448, 474, 325 P.3d 1075 (2014) (erroneous "'half second'" description of premeditation); *State v. Holmes*, 272 Kan. 491, 497-500, 33 P.3d 856 (2001) (prosecutor's statements that "'premeditation can take a second . . . [i]t can happen in a second'" were misstatements of law); *State v. Cosby*, 285 Kan. 230, 248, 169 P.3d 1128 (2007) ("We have consistently found reversible misconduct when a prosecutor states or implies that premeditation can be instantaneous.").

However, the State disagrees with Mendez' claim that it was error to state premeditation could be formed in "five seconds." Mendez does not cite any caselaw supporting his claim that "[f]ive seconds is too close to instantaneous."

As we explained in our cookie analogy in *Stanley*, 312 Kan. at 572-73, we conclude that five seconds is enough time for an internal "second thought" or a hesitation to arise—such as when I see a cookie, reach for it, and momentarily hesitate as I ask myself if I really want to eat the cookie before dinner. "The temporal space required to complete that process may be very short—a mere hesitation, perhaps, as my hand hovers over the cookie and I complete the internal double-check." 312 Kan. at 573. While the temporal space required to complete the internal double-check cannot happen in "one

second" or "instantly," it may very well occur within five seconds. See *State v. Hall*, 292 Kan. 841, 850, 257 P.3d 272 (2011) (finding no error when prosecutor said premeditation could be formed in "'seconds, minutes, days'" when reference was preceded with "'there's no element of time necessary'").

Having found one error with respect to the State's comment that premeditation could be formed in "one second," we now turn to analyzing harmlessness. In arguing that the error was not harmless, Mendez relies on the same arguments made above regarding the sufficiency of the evidence of premeditation, "specifically that premeditation couldn't have been formed in the few seconds from the 'disrespect' to the shooting," and that the prosecutor's misstatement of the law caused the jury to convict even though there was no evidence of premeditation. However, as we discussed above, though the interval from the "disrespect" to the shooting was brief, it was long enough for Mendez to form premeditation, and the State presented sufficient evidence of premeditation.

Moreover, the jury received accurate instructions on the law of premeditation. And the prosecutor's closing argument correctly and accurately stated the law regarding premeditation and what it requires, and referred the jury to the definition in the instructions. As such, we conclude the prosecutor's "one second" statement was harmless.

*The instruction of "knowingly" in the aggravated robbery instruction is not clearly erroneous.*

This issue is likewise governed by our three-step standard of review for jury instruction issues as set forth above. *Holley*, 313 Kan. at 253. Mendez did not object to the instruction at trial, so we review for clear error.

26

Mendez claims the definition of "knowingly" in the aggravated robbery instruction was clearly erroneous because it used an "or" when it should have used an "and." The instruction as given read:

> "A defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about, or of the circumstances in which he was acting, *or* that his conduct was reasonably certain to cause the result complained about by the State." (Emphasis added.)

Mendez relies on *State v. Hobbs*, 301 Kan. 203, 340 P.3d 1179 (2015), and *State v. Thomas*, 311 Kan. 905, 468 P.3d 323 (2020), to argue that the knowingly instruction here was erroneous. Those cases involved the crime of aggravated battery, the statutory definition of which we found to be "less than precise" and therefore looked beyond the plain language of the statute. *Hobbs*, 301 Kan. at 207. Specifically, we found that "'knowingly,' as used in the context of the elements of aggravated battery, means more than just proving that the defendant intended to engage in the underlying conduct. The State must prove the defendant acted when he or she was aware the conduct was reasonably certain to cause the result." *Thomas*, 311 Kan. at 908. Mendez cites those cases then simply asserts that the knowingly instruction as given in his case was likewise error. But notably, those cases were limited to the "context of the elements of aggravated battery." 311 Kan. at 908. And unlike the battery statute, the robbery statute contains no ambiguity about what resulting harm is required—it requires "knowingly taking property from the person or presence of another by force or by threat of bodily harm to any person." K.S.A. 21-5420. Mendez fails to explain how that language is unclear.

Moreover, as the State points out, the instruction as given matched the PIK:

> "[A defendant acts (knowingly) (with knowledge) when the defendant is aware *insert one or more of the following as appropriate for the crime charged*:

27

- of the nature of (his) (her) conduct that the State complains about.

  or

- of the circumstances in which (he) (she) was acting.

  or

- that (his) (her) conduct was reasonably certain to cause the result complained about by the State.]" PIK Crim. 4th 52.010 (2021 Supp.).

The PIK instruction accurately reflects the definition of "knowingly" in K.S.A. 21-5202(i), which provides:

"A person acts 'knowingly,' or 'with knowledge,' with respect to the nature of such person's conduct or to circumstances surrounding such person's conduct when such person is aware of the nature of such person's conduct or that the circumstances exist. A person acts 'knowingly,' or 'with knowledge,' with respect to a result of such person's conduct when such person is aware that such person's conduct is reasonably certain to cause the result."

And the PIK uses "or" in between each of the three options, and specifically instructs the court to "insert one or more of the following as appropriate." We "strongly recommend[] use of the pattern instructions because they '"have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions."'" *State v. Wimbley*, 313 Kan. 1029, 1031, 493 P.3d 951 (2021). And "if a court follows the PIK instructions, more than likely the instruction will be legally correct, not because of any independent legal significance of the pattern instruction, but because the committee usually writes an instruction that accurately reflects the law." 313 Kan. at 1031. Because PIK Crim. 4th 52.010 accurately states the law and the instruction used by the district court mirrored the PIK instruction, there was no instructional error.

*Cumulative error did not deprive Mendez of a fair trial.*

Cumulative trial errors, when considered together, may require a defendant's conviction to be reversed when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of trial errors, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

Here, only one error has been identified: A single prosecutorial error in stating premeditation could be formed in "one second." Though we concluded the foreseeability instruction was legally inappropriate, we held that it did not amount to clear error. As such, it is not a part of our cumulative error review. See *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024) (holding "an unpreserved instructional issue that is not clearly erroneous" is not "considered in a cumulative error analysis"). Accordingly, since there is only one error here—the prosecutorial error—we need not conduct a cumulative error analysis. See *State v. White*, 316 Kan. 208, 217, 514 P.3d 368 (2022) (cumulative error doctrine inapplicable if only one error is identified).

CONCLUSION

Mendez' aggravated robbery convictions with respect to Cool, Hodge, and Farafontoff are reversed as lacking sufficient evidence. All other convictions are affirmed.

Affirmed in part and reversed in part.

* * *

WILSON, J., concurring: I concur with the majority's analysis and holdings in all but one matter. I write separately to reiterate my disagreement with the majority's recent sua sponte shift away from considering unpreserved jury instruction errors within our cumulative error framework. *State v. Waldschmidt*, 318 Kan. 633, 669-70, 546 P.3d 716 (2024) (Wilson, J., dissenting). Because our cumulative error analysis ultimately asks, as a constitutional matter, "whether an accused has been afforded a fair trial," I continue to question our unprompted and unbriefed embrace of "simple statutory construction" over core constitutional concerns. 318 Kan. at 670 (Wilson, J., dissenting).

Even so, the result would not be changed here even if we were to aggregate the instructional error with the prosecutorial error. For reasons the majority deems the instructional error was not clearly erroneous, I would also conclude that the error was harmless beyond a reasonable doubt—as required when cumulative error encompasses an issue of constitutional concern. E.g., *State v. Carr*, 314 Kan. 615, 723, 502 P.3d 546 (2022), *cert. denied* 143 S. Ct. 581 (2023). And although both the foreseeability instruction error and the prosecutor's "one second" error broadly touch upon the issue of intent, they were ultimately unrelated and, in my view, could not have compounded one another. Cf. *State v. Tully*, 293 Kan. 176, 205-06, 262 P.3d 314 (2011). Thus, I concur in the majority's result.