NOT DESIGNATED FOR PUBLICATION

No. 126,678

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

COURTNEY L. KIPERS,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; C. WILLIAM OSSMANN, judge. Oral argument held February 10, 2026. Opinion filed March 13, 2026. Affirmed.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., MALONE and HILL, JJ.

HILL, J.: One way to attract the attention of the Topeka police at 2 a.m. is to drive 65 miles an hour in a 40-mile-per-hour zone, then, while stopped at a stoplight, hold a blowtorch out of your driver's window and holler and scream. Courtney L. Kipers learned this lesson early one morning in April 2022 when the police noticed her actions.

In life and law enforcement, one event often leads to another. Kipers was stopped then arrested for littering when she threw her insurance information on the ground. This arrest and her erratic speech and actions she displayed during this stop gave the police

1

good reasons to search her car with the use of a drug dog. The car search revealed drugs and paraphernalia. The State prosecuted, and the jury found Kipers guilty of possession of methamphetamines and drug paraphernalia, as well as speeding. She now appeals, claiming the district court erred when it failed to suppress the evidence seized during the search of her car. In her view, her arrest for littering was bogus and the contraband discovered in her car should have been suppressed.

*Kipers' actions attract police attention one morning.*

To provide a factual context for our ruling, we present a recitation of the circumstances of this traffic stop that turned into a drug arrest. Officer Christopher Janes of the Topeka Police Department was on patrol with his K-9 partner. He observed a black Honda Civic traveling westbound on Southwest 29th Street at 65 miles per hour in a 40-mile-per-hour zone. Janes got behind the vehicle and began calling in a traffic stop to dispatch. While stopped at a red light, Janes had his windows cracked and could hear the driver "hollering and screaming." He then saw her hold a yellow blowtorch out of the driver's window.

After Janes activated his emergency lights, the driver accelerated, turned without signaling into a parking lot, made a wide turn, and stopped abruptly in the middle of the lot. Janes testified this was abnormal; drivers typically pull to the roadside when they see emergency lights. The driver, later identified as Kipers, immediately exited her vehicle. Janes instructed her to get back in the car. She asked, "Why, are you gonna shoot me?" Janes assured her he was not going to shoot her.

Kipers then stated she could not go to Lawrence but could "do whatever the fuck [she] wants here." Once she returned to her seat, Janes approached. He told her she had been traveling 65 miles per hour. She responded, "Yeah so." When he noted the illegality, she said, "Everyone else is doing illegal shit."

Janes requested Kipers' driving license and proof of insurance. She responded that if he gave her a ticket, he should "arrest every criminal out here tonight, including the one that stole [her] daughter." She handed over her license. And she began looking for her insurance. She then tried to hand him an envelope, indicating the insurance was inside the envelope. He asked her, "Do you mind getting it out for me?"

Janes testified that, rather than removing the insurance from the envelope, Kipers started to exit the car. Janes told her, "Nope, getting the insurance out. You stay in the car." Kipers responded, "Oh, I'm sorry. You have to be more specific." She then threw her insurance paperwork toward him, where it landed on the ground, and said, "You can pick that up."

Janes testified that, at this point, everything seemed "abnormal." He cited Kipers' behavior at the stoplight—screaming and holding the blowtorch out the window—along with her driving: quick acceleration, abrupt stopping, no turn signals, and excessive speeding. He testified that "[a]ll of those were signs of something not being right and being abnormal" and that he was "pretty suspicious of criminal activity."

He testified that "based on her erratic behavior, I was suspecting narcotics use." He also noted she had committed the misdemeanor crime of criminal littering in his presence by throwing the insurance papers on the ground. He testified that, given the circumstances, he decided to wait for backup before placing her into handcuffs.

While waiting for his backup to arrive, Janes saw Kipers retrieve the yellow blowtorch from the passenger side, display it briefly, and toss it to the passenger floorboard. Janes testified that Kipers was "excessively animated" and her movements heightened his safety concerns because "she was reaching around the car quite a bit" and "actually throwing things on[to] the dash[board] of the car." Janes directed her to "put her hands on the steering wheel."

3

Without prompting, Kipers stated, "I'm not going to jail, so, that's that. Nope. Not here, not there again." She claimed the papers "flew out of my hands." Gesturing to an item on her rearview mirror, she said, "This is my daughter, she's been in Lawrence for two years because you guys don't know how to do your fucking job. That's the truth. Sorry. Truth hurts." She then mentioned cookies her mother bought—"they're NO. BAKES."

Janes testified that, while waiting for his backup officer, Kipers continued talking about her daughter being stolen, which was unrelated to the stop. He testified that although he did not ask her any questions, she continued "making other statements that made no sense based on the context of what [they] were doing." He testified Kipers' actions reinforced his belief she was under the influence of narcotics.

Janes testified that he detained Kipers because he was "investigating a reasonable suspicion" that he "developed during the traffic stop" that she was under the influence of narcotics and because he had "probable cause that she committed the criminal offense of criminal littering, which is a misdemeanor in the city of Topeka." Based on his training and experience, "with her erratic behavior, her statements, her behavior during the traffic stop, [he] believed that [Kipers] was under the influence of narcotics." He explained he was simultaneously working a traffic stop for speeding, a narcotics investigation, and the littering matter.

Officer Tyler Wohler, of the Topeka Police Department, arrived as backup. After Wohler arrived, Janes asked Kipers to step out of her car. As he placed her in handcuffs at 1:57 a.m., she asked why. He replied, "[B]ecause [you were] acting like a crazy person. And you littered right in front of me." Kipers protested that the papers were laminated and were her insurance. Janes responded, "Well, you probably shouldn't have thrown it out at me 'cause that's a problem." He concluded: "You're driving 65 miles an hour. You jump out of the car on me and are acting crazy, so you're gonna go to jail."

4

At the suppression hearing, Janes testified that he arrested Kipers for committing the City of Topeka misdemeanor offense of criminal littering in his presence. He identified the littering as her act of tossing her proof of insurance paperwork in his direction after he had asked for it and "throwing them on the ground." He testified he was "still investigating the narcotics that he believed to be in play" and that "she was also in custody for criminal littering." He described it as "all one event—all encompassing one event."

Janes testified that, based on his suspicions that Kipers was under the influence of narcotics, at 2:02 a.m., he deployed his K-9, Rebo, around the exterior of Kipers' vehicle. The dog alerted at the driver's door and jumped into the open window.

Janes testified that the alert gave him probable cause to search Kipers' car for narcotics. He then searched the vehicle and found a black bag in the passenger seat containing a baggie of suspected methamphetamine. The Kansas Bureau of Investigation later confirmed the substance was methamphetamine. Janes also found suspected drug paraphernalia: a glass pipe with residue and burn marks, a red straw, a spoon, Q-tips, and additional pipes.

The stop commenced at 1:54 a.m.; handcuffing occurred at 1:57 a.m.; the K-9 was deployed at 2:02 a.m.

*Is this case just about littering? The parties adopt opposing views.*

Kipers argues the criminal littering arrest was invalid because she was not disposing of refuse—she was providing documents the officer requested. She concedes she tossed the insurance paperwork toward Janes and told him, "You can pick that up," but contends this was rude compliance, not littering. She points to Janes' own words as

5

evidence that the real reason for the arrest was her behavior: "You're driving 65 miles an hour. You jump out of the car on me and are acting crazy, so you're gonna go to jail."

Kipers argues that the district court never ruled on the legitimacy of the arrest but "simply [took] for granted that the arrest was legitimate and continued its analysis accordingly." She contends that, without a valid arrest, the traffic stop remained ongoing. Extending that stop to conduct a dog sniff required reasonable suspicion, which she asserts Janes lacked.

In the alternative, Kipers argues that, even apart from the arrest question, Janes did not have reasonable suspicion to extend the stop. She contends the behaviors Janes cited—speeding, hollering, holding a blowtorch, erratic parking, and animated speech—could reflect frustration, disdain for police, or mental health issues rather than narcotics use. At trial, defense counsel pointed out in closing argument that Janes testified he never conducted field sobriety tests or sought a blood draw despite claiming to suspect drug impairment.

Kipers maintains that the evidence obtained from the search should have been suppressed. She asks us to reverse the district court's denial of her motion to suppress and remand for a new trial.

Taking an opposing position, the State argues Janes witnessed Kipers commit the misdemeanor of criminal littering when she threw her insurance paperwork on the ground after he asked for it. The State asserts that this authorized her arrest under K.S.A. 22-2401(d). Once she was in custody, her car was parked in a public parking lot. Citing *State v. Wilson*, 320 Kan. 411, 416, 569 P.3d 512 (2025), the State contends that a dog sniff of a vehicle's exterior in a public place does not implicate the Fourth Amendment to the United States Constitution. There was therefore no legal reason to suppress the contraband found in Kipers' car.

In the alternative, the State argues we can affirm the district court as right for the wrong reason because Janes had reasonable suspicion that Kipers was under the influence of narcotics before deploying the K-9. The State points to excessive speeding, hollering and screaming, holding a blowtorch out the window, abrupt acceleration and odd parking, immediately exiting her vehicle after parking, statements that did not make sense in context, fast and mumbled speech, and erratic behavior.

The State argues that the district court properly denied Kipers' motion to suppress and requests we affirm.

*We focus here on legal questions, not questions of fact.*

"When . . . the material facts supporting a district court's decision [on a motion to suppress evidence] are not in dispute, the ultimate question of whether to suppress is a question of law over which we exercise unlimited review." *State v. Mendez*, 319 Kan. 718, 735-36, 559 P.3d 792 (2024). There is no dispute of material facts here.

*We look at the big picture, not just one part of what happened.*

There is far more to this case than Kipers' disrespectful conduct of throwing her insurance papers on the ground, whether we label it littering or rude compliance with an officer's request. After all, we are considering an arrest for littering, and we are not reviewing a littering conviction. Instead, we must take into account all the circumstances in deciding whether this search and seizure was reasonable.

This encounter began with Janes making a traffic stop for speeding. This stop escalated into an arrest for littering. From there, considering Kipers' nonstop speech and erratic actions, the officer's reasonable growing suspicion of her drug use led to the

deployment of the drug dog. From that dog's positive reaction, the circumstances led to the discovery of the contraband and then her arrest for drug and paraphernalia possession.

Was the warrantless search of Kipers' vehicle reasonable? Does it fall within a recognized exception to our search warrant requirement? From its ruling, it appears that the district court answered these questions affirmatively, implicitly found the littering arrest valid, and then proceeded directly into an analysis of the law relating to dog sniff searches of parked cars.

A warrantless arrest is justified when, during a lawful detention, an officer develops probable cause to believe the individual has committed or is committing an offense. K.S.A. 22-2401(c); *State v. Goodro*, 315 Kan. 235, 238, 506 P.3d 918 (2022). "'Probable cause . . . signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *State v. Rozell*, 315 Kan. 295, 305, 508 P.3d 358 (2022). Even if the evidence is weak, it suffices if it tends to establish that the offense was committed and that the defendant committed it. *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012).

Criminal littering requires "recklessly depositing or causing to be deposited any object or substance" onto public or private property. K.S.A. 21-5815(a). "Recklessly" means "consciously disregard[ing] a substantial and unjustifiable risk." K.S.A. 21-5202(j).

But probable cause does not require proof of every element. It requires only evidence tending to establish that an offense was committed. *Washington*, 293 Kan. at 734. Janes saw Kipers throw papers onto the ground in a parking lot. Whether she acted "recklessly" or whether providing a requested document negates the offense are questions that go to guilt—not to probable cause. Janes had sufficient probable cause to believe criminal littering occurred.

We thus make explicit what the district court found implicitly:  The officer here had probable cause to arrest Kipers for littering. But our analysis does not end there.

*There was probable cause to use the drug dog.*

We do not limit our examination of these facts to littering. A brief record review reveals significant signs of drug usage by Kipers.

During the stop, Janes observed the following:

- Kipers asked, "Why, are you gonna shoot me?" when instructed to return to her car.
- She stated she could not go to Lawrence but could "do whatever the fuck [she] wants here."
- When informed she was speeding, she responded, "Yeah so" and said, "Everyone else is doing illegal shit."
- She made unsolicited statements about someone stealing her daughter and about "no bakes" cookies.
- She threw her insurance paperwork toward Janes and told him, "You can pick that up."
- She retrieved a blowtorch from the passenger side and tossed it to the floorboard.
- She reached around the vehicle and threw items onto the dashboard.

Janes testified he was "pretty suspicious of criminal activity" and suspected narcotics use based on Kipers' erratic behavior. He waited for backup before handcuffing her. We conclude that the drug dog was employed not because Kipers littered, but

because of the way Kipers was speaking and acting. Janes had good reason to use his drug dog based on Kipers' speech and actions.

Searches of automobiles are permitted if there is probable cause; the mobility of the vehicle provides exigent circumstances. *State v. Crudo*, 318 Kan. 32, 35, 541 P.3d 67 (2024). "Probable cause to search a vehicle exists when the totality of the circumstances indicates there is a fair probability that the vehicle contains contraband or evidence of a crime." *State v. Howard*, 305 Kan. 984, 990, 389 P.3d 1280 (2017). Janes certainly had probable cause to search the car after the dog alerted. The question then becomes whether the dog sniff that generated the probable cause was itself lawful.

A dog sniff of a vehicle's exterior in a public place does not implicate the Fourth Amendment when the car is legally parked and no one is attempting to or prevented from lawfully moving it. *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007); *Wilson*, 320 Kan. at 416-17. Citing *Engles*, the district court relied on this principle, reasoning that, once Kipers was in custody and her car was in the parking lot, the officers could run the dog around the vehicle without reasonable suspicion or probable cause. The State defends this reasoning.

Kipers argues that the "parked-car" status was itself a product of an invalid arrest—that, absent the arrest, she would have driven away, and the car would not have been left unattended. And a traffic stop may not be measurably extended beyond the time necessary to process the violation *without reasonable suspicion of additional criminal activity. Rodriguez v. United States*, 575 U.S. 348, 354, 135 S. Ct. 1609, 191 L. E. 2d 492 (2015). Here, Janes had reasonable suspicion of additional criminal activity—Kipers' suspected drug use.

Even though Janes had arrested Kipers for littering, he also had good reasons to hold her based on his reasonable suspicions of her criminal activity of possible drug usage and possible possession of contraband. There is no rule that an accused must be arrested for only one crime. Specific charges are sorted out later when a complaint is filed. For our purposes, we must answer the question, was this search and seizure reasonable? We answer:  It was.

Affirmed.